## MARY MACDONALD v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

### Division One, April 13, 1909.

1. **PERSONAL INJURIES: Returning to Work: Death Eight Months Later.** Where a passenger upon the derailment of a cable car received severe injuries about the head, shoulder and breast, the fact that a month later, in a crippled way, he took up his vocation and went about his work, is a circumstance for the jury, but not conclusive that his death eight and one-half months after the injuries were received was not caused by them. The performing of one's duties is not inseparable from a prior injury eventually ending one's life.

2. ———: ———: ———: **Angina Pectoris.** Nor is the fact that the injured passenger's physicians were for several months after his injuries unable to discover heart trouble, that he later died in a paroxysm of *angina pectoris*, and that *angina pectoris*, defined as "a strangling pain in the chest," may arise from many and different independent causes, a conclusive reason for holding that his injuries did not eventuate in his death, or for holding that a verdict is based upon mere conjecture. Medical science has not so far developed that a physician can tell with certainty whether a disease exists in the heart for one, two, three or four months after an injury, for it is a fact that such insidious diseases not uncommonly baffle diagnosis.

3. ————: **Doctors' Theories,** under oath on the witness stand, are merely advisory in character. Juries can accept or reject that advice on the condition only that it seems reasonable or unreasonable to them. And where doctors disagree, it is not valid reasoning to say that juries should also disagree, or should take the advice of one set against that of the other.

4. ————: **Death Eight Months Later: Conjecture: Question for Jury.** A passenger on a cable car, when it was derailed, was thrown violently against the framework of a stove, and struck a tremendous blow, on the head, shoulders and breast. There was substantial evidence that in former years he had been afflicted with lumbago, but for five or six years prior to the accident he had been hale, hearty and assiduously devoted to his legal practice; that the mere visible signs of his injury at the time were not great; that about a month later he went, in a crippled way, to his office and attended to such duties as could not be postponed; that he complained of heart troubles, and severe pains in his shoulder and breast, but his physicians for some months could find no heart troubles; that later he was seized with paroxysms of *angina pectoris*, whose cause is not always or usually traceable, and that about eight and a half months after the injury he died in one of such paroxysms. The controlling fact in the case, deducible from its history, is that, traceable to that injury, he was never afterwards a well man, and that, after a rally at the start, he went steadily down hill to his grave. *Held, first,* that it would be dealing only with the surface of things to stop with the fact that no visible sign of great injury was immediately apparent upon the accident; *second,* there was a chain of evidence, from which no link is missing, from which the jury might rationally base their conclusion that the injury caused his death, and, independent causes having been suggested and conflicting theories developed before the jury, it was for them to say which theory was the most reasonable.

5. ————: **Instruction: Causing or Hastening Death.** The court instructed the jury that if they believe from the evidence that the death of deceased "was directly caused by being thrown against the stove on defendant's car, then your verdict should be for plaintiff, notwithstanding you may further believe that he had previously suffered from lumbago or rheumatism, provided the jury further find that he would not have died at the time, under the circumstances and in the manner he did die, had it not been for being thrown against said stove." *Held,* that the instruction required the jury to find that the injury "directly caused" the death of deceased, and did not permit a recovery if the injury merely hastened his death; and, therefore, it is not necessary to decide whether or not, under the

Damage Act which permits a recovery where the death of one person is "caused" by the act of another, the hastening the death of another is causing his death. [Criticising Jackson v. Railroad, 87 Mo. 422.]

6. **GENERAL NEGLIGENCE: Sufficient Pleading: Necessary Proof: Passenger.** The petition charged: "That in rounding said curve the cable car aforesaid in which the said John L. MacDonald was riding came to a sudden stop, which was caused either by the negligent and careless condition in which the appliances used by said defendant for going around said curve were allowed to remain, or by the careless and negligent manner in which the gripman discharged his duty in managing and controlling said car, but it was either the one or the other, or both, as plaintiff believes and alleges, and she is ignorant whether it was the one or the other. By said sudden and violent stoppage of said car, said John L. MacDonald was thrown violently forward and down," etc. *Held*, that the petition charges general negligence, and plaintiff had the right to assume that the violent stop was negligent without putting in proof of what caused it.

7. ———: ———: ———: **Raised on Appeal.** Where the case was tried throughout on the theory that defendant conceded its negligence, and the instructions on both sides inferentially assumed it, the point raised, for the first time in a brief filed after submission, that plaintiff's instructions enlarged the issues made by the pleadings and permitted a recovery without proof of the particular negligence specified in the petition, will be disallowed, since the point is a new one and not in accord with the theory on which the case was tried. Such shift of position is bad on appeal.

8. ———: **Instruction: Anticipated Death: Outside of Common Experience: No Evidence.** An instruction telling the jury that if the particular result of defendant's negligent acts (in this case, the death of deceased from heart disease) could not have been anticipated by reasonably prudent persons, the finding must be for defendant, is properly refused where there is no substantial evidence showing it to be outside of the experience of mankind that heart disease would result from a shock or injury like that which the evidence shows deceased received, or that such heart disease would result fatally. The rule is that the liability of a person charged with negligence does not depend on the question whether, with the exercise of reasonable prudence, he should or ought to have foreseen the very injury complained of; but he may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his act.

9. **EVIDENCE: Medical Books: Use in Examining Witnesses.** Medical books are not independent evidence, yet there is a legitimate use to which such books may be put, at least on cross-examination, where the testimony has taken a wide range and where skilled witnesses, testifying as experts, base their testimony on their knowledge derived from books, as well as experience. It is not error to permit counsel to hold such books in his hands and formulate questions from their language, putting propositions to the witnesses obviously asserted by the author, the court telling the jury that anything read from the books is not to be considered by them unless answered in the affirmative.

Appeal from Jackson Circuit Court.—*Hon. H. L. Mc-Cune,* Judge.

AFFIRMED.

*John H. Lucas* and *Chas. A. Loomis* for appellant.

(1) There was no evidence that the death of deceased was directly or proximately caused or produced by the injuries sustained in the accident. (2) The court erred in refusing instructions numbered three, four and nine, asked by defendant. Hicks v. Railroad, 46 Mo. 309; Shearman & Redfield on Negligence (5 Ed.), sec. 28; Brown v. Railroad, 20 Mo. App. 227; 1 Sutherland on Damages, secs. 23 and 29; Saxton v. Railroad, 98 Mo. App. 501; Christy v. Hughes, 24 Mo. App. 275; Banks v. Railroad, 40 Mo. App. 464; Waller v. Railroad, 59 Mo. App. 426; Bradford v. Railroad, 64 Mo. App. 475; Lawrence v. Ice Co., 119 Mo. App. 331; Foley v. McMahon, 114 Mo. App. 442; Ray on Negligence, pp. 133 and 134; American Brewing Ass'n v. Talbot, 111 Mo. 683; Webb's Pollock on Torts (Enlarged Am. Ed.), pp. 45 and 46. (3) The court erred in permitting plaintiff's counsel to read to the jury from medical books, same being hearsay and secondary evidence. 1 Greenleaf on Evidence, sec. 52 and sec. 440; 16 Cyc. 12, 13 and 14 and cases cited in notes 78 and 88; Bailey v. Kreutzman, 141 Cal. 519;

People v. Wheeler, 60 Cal. 581; Gallagher v. Railroad, 67 Cal. 13; Lilly v. Parkinson, 91 Cal. 655; People v. Golderson, 76 Cal. 348; Fox v. Peninsula White Lead Co., 84 Mich. 876; Marshall v. Brown, 50 Mich. 148; People v. Millard, 63 Mich. 63; People v. Vanderhoof, 71 Mich. 158; Boehringger v. Richardson Med. Co., 9 Tex. Civ. Rep. 284; Wharton on Evidence, sec. 665; Rogers on Expert Testimony, sec. 179; Burt v. State (Tex.), 40 S. W. 1000; Wright v. State (Tex.), 44 S. W. 513. (4) The court erred in overruling defendant's objections to hypothetical questions propounded by plaintiff's counsel which assumed facts not proven, and which did not state or present to the witnesses all of the facts proven, or all the facts which the witnesses should know and consider in answering the questions. Senn v. Railroad, 108 Mo. 143; Culbertson v. Railroad, 140 Mo. 35; Mammerberg v. Railroad, 62 Mo. App. 563; Heinzel v. Railroad, 182 Mo. 555. (5) The court erred in giving instruction 4 asked by plaintiff, and in admitting evidence offered by plaintiff in support thereof, proving or tending to prove that notwithstanding the injuries received might not be such as to primarily cause or produce death, yet if they were sufficient to or did aggravate the then diseased condition of the deceased, in such a manner as to hasten his death, or shorten his life, then defendant would be liable for his death. And the court erred in giving instruction 4 asked by plaintiff, in effect telling the jury that defendant was liable if the injury only hastened his death. Jackson v. Railroad, 87 Mo. 422; 1 Thompson on Negligence, sec. 153; Gray v. McDonald, 28 Mo. App. 488. (6) The court erred in refusing instructions 10 and 12 asked by defendant. If injury result which may reasonably be attributable to two or more causes, for one of which defendant is liable, and for the other of which defendant is not liable, plaintiff must prove with reasonable certainty that the cause for which defendant is liable did in fact produce the in-

jury. Smart v. Kansas City, 91 Mo. App. 586; Young v. Railroad, 113 Mo. App. 636; Browning v. Railroad, 106 Mo. App. 729; Fuchs v. St. Louis, 167 Mo. 620; Deamet v. Storage Co., 121 Mo. App. 92; Warner v. Railroad, 178 Mo. 131. (7) Error was committed in the giving of instructions 1, 2, 3, 4, and 5 asked by plaintiff. The instructions enlarge the issues presented by the pleadings between plaintiff and defendant, and were erroneous for that reason. Roscoe v. Railroad, 202 Mo. 576; Davidson v. Railroad, 211 Mo. 361; Beave v. Railroad, 111 S. W. 58.

*A. L. Cooper* and *Karnes, New & Krauthoff* for respondent.

(1) Appellant cannot be heard to say that the result of such an injury could not have been by it foreseen or expected. Foley v. McMahan, 114 Mo. App. 448; Smith v. Railroad, L. R. 6 C. P. 20; Hoeppe v. Southern Hotel Co., 142 Mo. 388; Graney v. Railroad, 140 Mo. 98; Miller v. Railroad, 90 Mo. 394; Kellogg v. Railroad, 26 Wis. 223; Harrison v. Electric Light Co., 195 Mo. 629; Lawrence v. Ice Co., 119 Mo. App. 331; 21 Am. and Eng. Ency. Law, 488; Drum v. Miller, 135 N. C. 204; Sickinger v. Mfg. Co., 129 Mo. 590; Beauchamp v. Mining Co., 50 Mich. 163; Railroad v. Buck, 96 Ind. 346. (2) If Macdonald died sooner than he would have died had he not been injured by the railroad, then it was the proximate cause of his death. This suit is based on Sec. 2864, R. S. 1899. Lynch v. Railroad, 112 Mo. 441; Higgins v. Railroad, 197 Mo. 312; Jackson v. Railroad, 87 Mo. 442; Gray v. McDonald, 28 Mo. App. 477; Felton v. Fidelity Co., 174 Mo. 256; Freeman v. Accident Ass'n, 156 Mass. 351; Strode v. Railroad, 197 Mo. 621. (3) Use of medical books proper, and court's directions as to same. State v. Soper, 148 Mo. 217; State v. Klinger, 46 Mo. 230; 3 Wigmore on Evidence, p. 1700; Yates v. Railroad, 40

L. R. A. 558; 17 Ency. Law and Proc., 421; 1 Greenleaf on Evidence (15 Ed.), sec. 440; Life Ins. Co. v. Ellis, 89 Ill. 576; Heiss v. Lowery, 122 Ind. 233; Howell v. Railroad, 147 Ind. 274; State v. Wood, 53 N. H. 484; Collin v. Simpson, 5 C. & P. 73. (4) Opinion of experts may be given. Gutridge v. Railroad, 94 Mo. 468; Eyerman v. Sheehan, 52 Mo. 223; Goins v. Railroad, 47 Mo. App. 173; Gavisk v. Railroad, 49 Mo. 274; 1 Greenleaf on Evidence (15 Ed.), sec. 446.

LAMM, P. J.—Defendant appeals from a judgment in plaintiff's favor for $5,000. She is the widow of John L. Macdonald, injured while a passenger on defendant's car on defendant's cable road, October 26, 1902, while running round a curve. In about eight months and a half afterwards he died. There is no question but that he was injured and by defendant's negligence. Plaintiff's theory is that such injuries caused his death. Defendant's is *contra*. The trial was long. The issues were threshed out below closely and with ability. The briefs take a wide range. The instructions were many. However laborious a task, we shall undertake to condense the voluminous record without omitting vital matter.

After allegations immaterial to any question made here, the petition alleges:

"That in rounding said curve the car aforesaid in which the said John L. Macdonald was riding came to a sudden and violent stop, which was caused either by the negligent and careless condition in which the appliances used by said defendant for going around said curve were allowed to remain, or by the negligent and careless manner in which the gripman discharged his duty in managing and controlling said car, but it was either one or the other, or both, as plaintiff believes and alleges, and she is ignorant whether it was the one or the other. By said sudden and violent stoppage of

said car, said John L. Macdonald was thrown vio-
lently forward and down, by which he was greatly in-
jured, and which injuries so received by him caused his
death, which occurred on the 13th day of July, 1903.''

The abstracted answer is a general denial. Plain-
tiff contends the trial answer had a plea of contribu-
tory negligence, but she files no counter or additional
abstract. Not only so, but no issue of contributory
negligence was submitted to the jury, and that feature,
on any view of the case, is by-matter.

Save on the medical testimony, there is little or no
dispute about the facts. The case made is this:

Judge Macdonald was between sixty-five and six-
ty-six years old when he died. He came to Kansas City
from St. Paul, Minnesota. In St. Paul (as in Kansas
City) his profession was that of a lawyer in full prac-
tice, though he had served in Congress and on the
bench. The winter before moving from St. Paul, he
was bothered with lumbago. Lumbago is an ailment of
a rheumatic kind, indicated by pain in the small of the
back. The occasion of his change from St. Paul to
Kansas City, was, primarily, to find a milder climate to
rid himself of lumbago or prevent its becoming
chronic, if lurking; secondly, to better his business out-
look. With these ends in view, he visited the South,
seeking a location in Louisiana, Texas, and Arkansas.
About a year prior, he had gone to Hot Springs and
spent a few days at the baths there. In his exploring
trip south, he again visited Hot Springs and took a
few baths. This was in 1897, and in the fall of that
year he settled in Kansas City. From that time until
his injury, five years later, he was apparently free from
lumbago or any other rheumatic trouble. He is de-
scribed in the record as leading an active life, as being
''a rugged, strong man,'' an ''industrious man,''
weighing about one hundred and eighty pounds, about
five feet ten inches in height, ''broad shouldered,''
''muscular,'' of an ''athletic type,'' temperate, with a

good appetite but restraining it, "a vigorous, strong man," "a very temperate man," "a well man," positive but of a jolly turn and a hard worker. This, up to the time of his injury.

On the 26th of October, 1902 (in prime health to all appearance), he, with his wife, Mary, was returning from church. Suddenly, while his car was going without check at, presumably, ordinary speed around a curve, the gripcar in the train was thrown from the track, the "trailer" on which he was riding was partly derailed, its front end thrown from the track, and he was violently projected ahead two or three feet, sidewise, against the immovable framework of the car stove. The cause of all this is left quite dark. One witness, speaking of the suddenness and force of the stop, said it was the same as if the car "had struck a house," another (after the accident) saw a broken rail. Judge Macdonald was on a seat running lengthwise of the car, with the stove on his side. He evidently was thrown against it with whatever force would be given him from the momentum of a car having the speed of that one; and the force is described by the inflamed but pardonable metaphor of one witness as the same as if he was "shot out of a cannon." Just what parts of his body struck the framework of the stove is not entirely clear. The visible sign of the blow was in the neighborhood of the left ear and side of the face, and covered a place the size of your hand. Other parts of his left shoulder and chest, evidently affected by the blow, must be got at by his pains ensuing at once and those developing hard on his injuries. That he was badly hurt is put beyond all question. Being in a dazed condition, presently, on recovering, he complained of his shoulder, neck and head. He was assisted out of the car and into a near-by drugstore.

One witness, helping him from the car to the drugstore, noticed he put his hand to the left side of his chest, and we may say, in passing, that this involuntary

and significant motion of putting his hand to his chest was noticed by his friends as time went on. Failing to reach his family physician from that drugstore, he was helped to another. There he communicated with him and then was assisted home. The record shows him apparently unable to walk without assistance. For two or three weeks he was confined to his bed under his physician's care. Hot appliances were put to his neck, shoulder and head and medicine administered to relieve his pain.

It would serve no useful or obvious purpose to go over the long history of his case. There was testimony put in by plaintiff strongly tending to prove that, from being a well man at the time of his injury, he became at once a sick man and continued a sick man until he died. Although he soon recovered from the visible wound in his head, yet he continued to have pain in his neck, shoulder and chest. He could not bear or wear a suspender on his left shoulder after that. He could not put on his overcoat without help and generally wore it with his left arm out of its sleeve. He lost appetite, his sleep was broken, he had "less vim and snap," became less assertive in his views and from that day his physical strength declined. The witnesses describe him as "growing gradually weaker," he looked "haggard," he seemed "worried and worn out," and was easily exhausted by physical effort. He never again walked with the springing and rising step he had before. His weight, beginning with that time, gradually fell off and he had that in his countenance, gait and demeanor making him a marked man to his near friends and acquaintances—some of them physicians of excellent standing. Some four weeks after his injury he began to go down town to his business office, but went later and came home earlier than was his wont. He complained of oppression in his breathing and, when walking with an acquaintance, he not infrequently took hold of his arm because of shortness of breath or pain

in his heart.   He could no longer lie down with com-
fort, and his barber shaved him seated bolt upright.
His partner testified that he may have tried two or
three cases after he returned to the office, but that he
was unable to work as he formerly had done and ar-
ranged to postpone his cases.   From the time of his
injury to the following May, solicitous about his heart,
he had himself examined time and again for heart
trouble—at any rate, such medical examinations were
directed to examination of cardiac conditions.   Until
in May, his family physician was unable to trace his
chest pains to heart trouble and by ear or stethoscope
could find no sign of abnormal conditions there, but in
the spring his condition, theretofore growing gradu-
ally worse and worse, developed into spells or par-
oxysms of pain in his chest.   It was then found by ex-
perimenting that these spells of pain yielded to a medi-
cine (amyl nitride) deemed by the faculty to be some-
what of a specific as a temporary relief in certain
phases of *angina pectoris,* and it was concluded by his
family physician that his heart was out of order.   In
these spells of agony his countenance became ashen
gray in color and drops of perspiration gathered and
ran down his face.   As time went on, they became more
severe and frequent until he died suddenly in one of
them on the thirteenth of July, 1903.

The tendency of the expert testimony on behalf of
the plaintiff was to show that he suffered from *ang.na
pectoris.*   That is not a disease, speaking with scien-
tific precision, but it is a horrible strangling pain in the
chest, affecting its victim with a sense of impending
dissolution and originating in discrepancies in the
heart, its arteries and valves, and the walls of those
arteries, whether main or subsidiary, and the pain runs
up through the left shoulder and down the left arm to
the fingers of the left hand.   We take it, the words,
*angina pectoris,* though defined literally as ''a strang-
ling pain in the chest,'' are as near a definition as the

faculty can give of diseased cardiac conditions leading up to the pain itself.   At all events, the term is used in the broad sense of a disease.

Plaintiff put in proof from competent physicians tending to show that *angina pectoris,* or the diseased condition of the heart and its appurtenant arteries and valves to which the pain so named attaches, in at least some of its phases, could naturally be caused by shock and injury and that it might be reasonably expected to gradually develop from small beginnings until it finally progressed far enough to carry its victim off. The term "shock," as used medically, is defined by one scientific gentleman on the stand to be "an unusual injury that a person may sustain that depresses nerve centers and lowers away vitality  very  extensively." Lumbago is said by plaintiff's experts to not be the phase of rheumatism affecting the heart. Heart trouble is said by them to arise now and then from inflammatory rheumatism, and decedent at no time had that.

Defendant put on   medical   experts,   profoundly skilled in heart diseases, who took an opposite view from that entertained by the learned scientific witnesses of plaintiff and gave the jury different advice.

There are one or two hundred pages of this expert testimony, in which lawyers and doctors vie in a battle of wits with each other in an analysis exhibiting wide and keen research in the mysterious realm of heart diseases.   It covers every phase of *angina pectoris,* which seems to be a most insidious and deadly trouble, sometimes existing without discoverable cause, sometimes referable to lead poisoning, rheumatism, gout, etc., thickening of the walls of the main and subsidiary arteries at the heart or irritating its valves, sometimes an incident to old age or intemperance, and which may originate from shock and traumatism.   The testimony is laden with a luxuriant medical terminology quite useless for the administration of justice, and we have

contented ourselves with shortly giving the tendency of it in everyday speech.

In seeking to disturb plaintiff's judgment, defendant's learned counsel insist that reversible error got into the case below in the giving and refusal of instructions and in ruling on the admission of testimony.

Among those refused were two demurrers—one at the close of plaintiff's and the other of the whole case.

There is a ground of reversal stated as follows: "The court erred in permitting counsel for plaintiff to read the contents of medical books to, and in the presence and hearing of, the jury."

Further it is insisted that the court erred in commenting upon the evidence during the progress of the trial.

Any other facts, necessary to develop and decide material questions made, will appear in the body of the opinion.

I.   The first proposition argued is that the demurrers should have been sustained, for that there was no evidence that the death of Judge Macdonald was directly or proximately caused by the injuries sustained in the accident.   But counsel argue ill, we think, in that behalf.   Their argument is built up, for example, on the views that deceased went about his labors after his injury, that physicians were unable for several months to determine the existence of heart trouble, that *angina pectoris* can arise from so many and different independent causes (even from undiscoverable ones) that to predicate it of his injury is mere conjecture, furnishing no legal basis for the judgment.   Other suggestions along that line are offered, but the foregoing will do for our purposes.

Evidently the fact that Judge Macdonald returned, in a crippled way, to his avocation could not be conclusive.   It was a circumstance, but one for the jury.   The heroism of facing one's fate in civil life like a soldier does his in war, and performing one's duty as best he

can until the end comes, is not inseparable from a prior injury eventually ending one's life. Labor, under such conditions, is referable to grit and courage, or the lack of these, to temperament, duty. If he had done no work at all after his injury, that fact alone would not have made a case for plaintiff, nor did his doing it destroy her case.

Nor do we have to go to physicians to find that medical science has not developed to the point where a doctor, however wise, can tell to a certainty whether a disease exists in the heart for one, two, three or four months after an injury, or that such insidious diseases not uncommonly quite baffle diagnosis. It must be borne in mind, too, that doctors' theories under oath on the witness stand are merely advisory in character. Juries can take or leave that advice on the condition only that it seems reasonable or not to them; and because doctors disagree, it is not valid reasoning to say that juries should also disagree, or should take the advice of one set as against that of another, or should throw to the winds their common sense and, with minds littered up with conflicting medical advice, be unable to come to any agreement whatever, even as sailors (tossed to and fro by contrary winds) reach no harbor.

In Sorenson v. Railroad, 36 Fed. 166, plaintiff's intestate in September, 1883, jumped from a train at the instance of the conductor and thereby suffered severe bruises. He soon began to "droop and fail," and in September a year later died. There was in that case as in this a suggestion that heart and aortic troubles existed prior to the injury. Physicians testified on both sides, and Mr. Justice BREWER, speaking to the point, said: "Where medical witnesses disagree in opinion and theory, the undisputed history of the case is often the most satisfactory and controlling fact. In this case such history fully justifies the verdict. . . . Soon

after this accident he began to droop and fail, and so continued failing, with a short and slight change for the better in the spring of 1884, until his death in September, 1884. Such a fact is significant, and upholds the verdict. I know that *post hoc* is not always *propter hoc,* but where the *propter hoc* is uncertain, the *post hoc* may often be decisive.''

So, in a very late case (Sharp v. Railroad, 213 Mo. l. c. 531), there is language in point, *viz.*: ''If a man, well to-day, is badly injured, and from that time on sickens (with symptoms referable to his injury), and, languishing, finally dies, a disagreement among doctors as to the name of the disease on him at the moment of dissolution does not create a condition from which it can be said that a verdict one way or the other is merely guesswork. . . . . For, if there had been no physicians testifying as experts and the jury had been without medical advice, yet plaintiffs' lay evidence showed a cause for Sharp's pain and suffering, and his visible approach to the grave in the steps he took, commencing at the place and time of his injury and ending there, are rational deductions within the right of a jury in applying common sense to facts. The expert medical testimony was merely advisory, and, because the advice given to the jury by the opinions of the doctors differed, that presents no case for our interference.''

In the case at bar there was substantial testimony that Judge Macdonald came to old age hale and hearty. On a certain day in October he is thrown against the framework of a stove and struck a tremendous blow. The mere visible sign of his injury at the time was not great, but it would be dealing only with the surface of things to stop with that visible sign. The controlling fact in the case (deducible from its history) is that, traceable to that injury, he was never again a well man, and that, traceable to that same injury, after a rally at the start, he went steadily down

hill to his grave. A blow such as he received was shown to be a probable cause of *angina pectoris*. As we see it, there is no link out in the chain of the evidence upon which the jury could rationally base their conclusion that the injury caused his death. Independent causes were suggested and conflicting theories were developed before the jury. It was for them to say which theory was the most reasonable. [Seckinger v. Mfg. Co., 129 Mo. 590; Fetter v. Fidelity & Casualty Co., 174 Mo. 256.]

In the latter case it was finely said by VALLIANT, J.: "The genius of our law does not claim for it infallibility; it recognizes that there is an element of uncertainty that enters into every forensic contest, which human wisdom cannot always make certain, and its aim is to come as close to the right as the means at hand will permit. Under our system of jurisprudence the jury is the tribunal to which questions of this kind are submitted for determination, and with all their human liability to err, we have never yet discovered any better tribunal for the trial of questions of fact, even where highly scientific propositions are involved. Science itself appeals to common sense for its recognition."

That the demurrers were not well taken under the facts here may be deduced from a line of other cases cited by respondent's counsel. [Hanlon v. Railroad, 104 Mo. 381; Walsh v. Railroad, 102 Mo. 582; Beauchamp v. Min. Co., 50 Mich. 163; Railroad v. Buck, 96 Ind. 346; Railroad v. Kemp, 61 Md. 74.]

II. Among the instructions given for the plaintiff was the following numbered 4:

"The jury are instructed that if they believe from the evidence that the death of John L. Macdonald was directly caused by being thrown against the stove on defendant's car, then your verdict should be for the plaintiff, notwithstanding that you may further believe

from the evidence that he had suffered from lumbago or rheumatism provided that the jury further find that said Macdonald would not have died at the time, under the circumstances and in the manner he did die, had it not been for being thrown against said stove, if you find he was so thrown.''

Evidence was admitted over defendant's objection laying a foundation for that instruction and it is contended the evidence was improperly put in and that the instruction is not good law. In other words, defendant contends that a cause of action can not be maintained for an injury "hastening" death. The rule is well established that an actionable wrong is committed under our Damage Act where circumstances exist outlined in the instruction criticized. For instance: Strode v. Railroad, 197 Mo. 616, was heard in Banc. In that case a new trial had been granted because of error in giving an instruction based precisely on defendant's above theory (p. 621). In reviewing that ruling our brother GRAVES, with the approval of all his brethren, said: "This instruction was clearly wrong and should not have been given. . . . . (Citing Fetter v. Fidelity & Casualty Co., *supra*). In granting a new trial upon this point the trial court was right and were it not for other propositions its judgment should be affirmed.''

Referring to the Fetter case, it will be seen that the court approved an instruction with the following clause: ''Provided that the jury further find that said Fetter would not have died at the time, under the circumstances and in the manner he did die had it not been for the accidental rupture of the kidney.'' That proviso is the identical one objected to in instruction 4 in the case at bar. The Fetter case follows the reasoning of Freeman v. Accident Ass'n, 156 Mass. 351, and in that case it was well said:

''An injury which might naturally produce death in a person of a certain temperament or state of health

is a cause of his death if he died by reason of it, even if he would not have died if his temperament or previous health had been different; and this is so as well when death comes through the medium of a disease directly induced by the injury, as when the injury immediately interrupts the vital processes."

We are cited to Jackson v. Railroad, 87 Mo. 422, and Gray v. MacDonald, 28 Mo. App. 477, as holding a contrary doctrine, but those cases must be strictly read in the light of the particular facts there held in judgment. In the Jackson case a man, mortally wounded by an officer making his arrest, was taken on board defendant's train for transportation to Arkansas. The carrier was sued on the theory that such transportation was wrongful and that such wrong hastened his impending death. In the case at bar, we are not called upon to either criticise or follow that case in its ruling that *hastening* is not *causing* within the meaning of the Damage Act. The jury were told there to find against defendant if the act complained of resulted in "causing or hastening his death."

The theory of that holding has its root in the phraseology of the Damage Act, Revised Statutes 1899, section 2865, transmitting a right of action, *viz.*: "Whenever the death of a person shall be *caused* by a wrongful act, neglect or default of another," under limitations prescribed. In Gray v. MacDonald, *supra,* one of the facts dealt with was that after decedent was wounded by a mortal shot by another, the defendant hit him with his fist. A careful reading of both of those cases shows that the point now up was not the turning one, nor are we called upon in this case to determine whether *hastening* is *causing* a death within the reasonable construction of the Damage Act; because, in this case, the instruction criticised put it to the jury to find that the injury "directly caused" the death of Judge Macdonald. If it were necessary to follow or reject the ruling in the Jackson case I should

greatly doubt the soundness of the construction there put upon the statute. It seems to me too narrow. For instance, if A shoots and mortally wounds B so that B would not instantly die but would linger, languish and finally die, does the Damage Act mean that C may thereafter blow out B's brains with a pistol bullet and escape civil liability for damage because he merely *hastened* the death? Did not C cause the death of B within the reasonable intendment of that statute? If A and B contribute to the death of C, did each one not *cause* the death within its purview? [Bragg v. Railroad, 192 Mo. l. c. 359]. If C is sick nigh unto death with a mortal disease and D, while in that condition, wrongfully injures him so that he dies shortly, did D not *cause* that particular death within the clear purview of that statute? We ask these questions, but leave them unanswered, the case not calling for it.

We rule the point against the defendant.

III. It is argued in a brief, filed after submission, that plaintiff's instructions erroneously enlarged the issues in the pleadings and permitted recovery without proof of the particular negligence specified in the petition. Plaintiff introduced testimony tending to show that the train while *en route* in rounding a curve came to an instantaneous stop and was derailed—throwing its passengers this way and that. It can hardly be contended that defendant should (or did usually) stop its trains in that fashion. It was not plaintiff's duty to plead, point out or prove specific acts of negligence resulting in this astonishing stop. We have held that if plaintiff pleads the specific acts of negligence leading up to the injury of a passenger, such pleading is tantamount to an admission that he *knows* the causes of the accident and, knowing and pleading them, he must prove them and limit his right to recovery to such proof. On the other hand, it is well-recognized doctrine that it is good pleading to plead negligence in

passenger cases generally and rely upon the doctrine of *res ipsa loquitur*. We are of opinion that the petition in this case does not plead specific negligence, as that term is used in the books. It could not say much less than it did. It is no more specific than the allegations of the petition in Chlanda v. Transit Co., 213 Mo. 244, and the charge there was held to be general. The gravamen of the charge is the violent stoppage of the car and that is said to have resulted from the general negligent and careless condition in which the appliances used by defendant were allowed to remain or in the negligent manner in which the car was managed. Plaintiff averred that she did not know which it was but that it was one or the other or both. Taken by or large, it would seem the charge was general, that plaintiff had pleaded no matter showing her knowledge, and that she had the right to assume that the violent stop was negligent without putting in proof of what caused it. Trains of cars in charge of human agencies do not stop in that way in and of themselves. Such stop is naturally referable to the human agency in charge of train, track or motive power. Therefore, as a carrier is under a duty to carry its passengers safely, it should explain its conduct in throwing them hither and yon as if shot out of a catapult. If it did not explain that conduct by proof showing its own high diligence and care, or by showing the intervention of some independent cause, it must be conclusively presumed guilty of negligence, for it has failed to rebut the *prima-facie* presumption of negligence arising from the unusual and violent stop. [Dougherty v. Railroad, 81 Mo. l. c. 329; Coudy v. Railroad, 85 Mo. l. c. 85-6; Lemon v. Chanslor, 68 Mo. 354, *et seq.*, and cases cited; Clark v. Railroad, 127 Mo. l. c. 208, *et seq.*]

We rule the point against defendant and put our ruling on the ground that from end to end the case was tried on the theory that defendant, for all practical purposes, conceded its negligence. Its own instruc-

tions inferentially assumed it, as did plaintiff's. In a brief of well nigh one hundred pages, in which learned counsel present point after point with discriminating vigor and learning, the point now up was not made. As said, it gets into the case in a brief filed after the hearing at our bar, and we must hold that such issue is a new one and not in accord with the theory on which the case was tried and determined below and briefed in this court. Such shift of position is bad on appeal.

IV. Defendant was allowed thirteen instructions as prayed, and another in modified form. It was refused seven. We shall not cumber the record with the instructions on either side. Those for the plaintiff were short, plain and direct. We see no fault in any of them. They proceeded on the theory that if this car came to a sudden stop, which sudden stop defendant could have prevented by the exercise of a high degree of skill, diligence and foresight, and if by said sudden stop Judge Macdonald was thrown forward and received injuries from which he died, then the jury should find for plaintiff. In another instruction, the jury were told that such sudden stop was negligent unless it was unavoidable and could not have been prevented by the exercise of a defined high degree of care. The fourth we have set out.

In defendant's given instructions, the jury were told that if the exact cause of Judge Macdonald's death was unknown or had not been satisfactorily shown, then their verdict must be for defendant. In another, they were told that the mere fact of decedent's injury gives plaintiff no right to sue; that before they can find for her they must find from the evidence that his death was directly and proximately caused by the negligence of defendant. In another, they were told that even though he was a passenger and was injured by the negligence of defendant, still they could not find for plain-

tiff "unless his subsequent death was the natural and probable result" of such negligence. In another, the burden was put upon plaintiff to prove by a preponderance of the evidence that defendant was negligent and that such negligence injured decedent, and that his subsequent death was directly and proximately caused and produced by such negligence. In another, they were told that if his death may have resulted from the injuries and may have resulted from other causes, not produced by the accident, then the verdict should be for defendant unless the plaintiff has proven with reasonable certainty by the greater weight of the evidence to the jury's satisfaction that his death was actually caused and produced by his injuries received in the accident. In another, the term "proximate cause" was elaborately defined and the jury were told that it meant a cause which "in a natural and continuous sequence, unbroken by an intervening cause, produces the injury, and without which the result would not have happened, and it is not enough that the injury is the natural sequence of the negligence, it must be also the probable sequence." In another, they were told that defendant was not the insurer of the safety of deceased and was not required to exercise a degree of care or foresight not reasonably practicable, etc. In another, they were still further instructed that defendant was not liable for every negligent act although injury ensued. The negligent act must be the proximate cause of the injury which, in turn, must also be the natural and probable result of the act. In another, they were instructed that if the injury was merely the result of an accident, no matter how produced, other than by the negligence of defendant's servants *in charge of the car,* then their verdict should be for defendant. (The last instruction was too favorable to defendant.) They were further instructed on the credibility of witnesses, and that the burden of proof was on plaintiff throughout the entire trial to

show that defendant's negligence was the direct and proximate cause of the injury. Further, they were instructed on the meaning of the term "a preponderance of the evidence" and were finally told that the case must be decided the same as if between two persons of equal standing in the community; that it must be determined on the evidence alone and the instructions given by the court; that the instructions read by the attorneys were the court's instructions.

The instructions refused for defendant were in some particulars covered by those given at its instance, but there is a series of refused instructions declaring that the jury must find for the defendant unless there was such connection between the negligent acts of defendant and the death of decedent "as to bring it within the reasonable contemplation of the defendant that such death would naturally and probably result" from the negligence. Changes are rung on this idea in other instructions. One is that the jury must find that Macdonald's death "was such as a reasonably prudent person would anticipate would be the likely and probable result" of such acts of the defendant. The central idea in these refused instructions is that if the peculiar result (in this case, the death of Judge Macdonald from heart disease) could not have been anticipated by defendant, the finding should be for defendant.

It may be said, generally, that if an unheard of result is produced by an act of negligence quite outside the experience of mankind and which could by no possibility have been foreseen, then an action will not lie for that result. But this case did not require instructions based on any such theory. This, because there was no substantial evidence showing it outside of the experience of mankind that heart disease should result from a shock and injury like that happening to decedent, or that such heart disease should result fatally.

Again—waiving that view: A good rule is: "The liability of a person charged with negligence does not

depend on the question whether, with the exercise of reasonable prudence, he could or ought to have foreseen *the very injury complained of;* but he may be held liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his act." [Fishburn v. Railroad, 127 Ia. l. c. 492, *et seq.,* and many cases cited; Dean v. Railroad, 199 Mo. l. c. 411; Foley v. McMahon, 114 Mo. App. l. c. 448; Hoepper v. Southern Hotel Co., 142 Mo. l. c. 388; Graney v. Railroad, 140 Mo. l. c. 98; Miller v. Railroad, 90 Mo. l. c. 394; Harrison v. Electric Light Co., 195 Mo. l. c. 629; Lawrence v. Ice Co., 119 Mo. App. l. c. 331-2; Brady v. Railroad, 206 Mo. l. c. 537; Zeis v. Brewing Assn., 205 Mo. l. c. 651.]

We find no fault with rulings on instructions.

V. In framing questions on the cross-examination of experts, counsel held in hand medical books and formulated questions from their language. The books were not read to the jury, but the jury could see that the examiner read from them. This method of cross-examination was objected to. The court, over objections, permitted plaintiff's counsel to adopt the scientific terminology of the author and put the propositions to the witnesses obviously asserted by him, but repeatedly cautioned the jury that what was read from the book was not evidence and the jury should pay no attention to it; that the only thing they could consider was the evidence that fell from the lips of the witness along the line of verifying the propositions put by the examiner. Samples of these cautionary instructions are as follows (THE COURT): "The jury will not give any more weight to anything Mr. Karnes reads from the books than they would to any other questions Mr. Karnes asks, unless the witness answers questions in the affirmative, thereby making it evidence in the case. . . . . It is the answers of this witness, gentle-

men of the jury, that is evidence in this case and not the questions.''

Error is assigned on this phase of the trial, but the point is without soundness. It has been said that it is within the discretion of the court to permit medical books to be read to the jury (State v. Soper, 148 Mo. l. c. 235-6), but undoubtedly the better and generally accepted doctrine is that the contents of such books are not admissible as independent evidence. [17 Cyc. 421; Railroad v. Yates, 79 Fed. l. c. 587, *et seq.*] Judge THAYER in the last case puts the grounds of exclusion on, first, such evidence is not delivered under oath; second, there is no chance of cross-examining the author; third, medicine is not an exact science, doctors disagree, medical theories are subject to frequent modification and change.

But while not independent evidence, and the question is a vexed one, yet there is a legitimate use of such books, at least, on cross-examination, where the testimony has taken wide range and where skilled witnesses, testifying as experts, base their testimony on their knowledge derived from books as well as experience, as in this case. Here, defendant's counsel had notified some of his witnesses that he was appealing to, and asking his doctors to draw from, their medical knowledge running back, say, two thousand years, and which could only be preserved, if at all, in book form from the days when Socrates ordered a cock sacrificed to Esculapius, the god of medicine, and Hippocrates and Galen practiced physic in Greece and Italy. Under such circumstances, we see no reason why counsel could not frame a proposition in medical science in the exact language of the author, and ask the witness whether he agreed to it, so long as this was done under the due guard of the cautionary instructions given by the court. Such is the doctrine of a learned and exhaustive note on section 440, Greenleaf on Ev. (15 Ed.), p. 579, where it is said: ''Moreover, it is a proper method of

cross-examination, in order to test the learning of a witness who testifies as an expert, to refer to books of approved authority upon the subjects under investigation, and question him in regard to them."

Mr. Justice SCOTT, in Conn. Mut. Life Ins. Co. v. Ellis, 89 Ill. l. c. 519, gives that proposition the indorsement of his strong pen, though stating that the rule is liable to abuse and great care should be taken to prevent such abuse. He there says: "Assuming to be familiar with standard works that treat of *delirium tremens,* it was not unfair to the witness to call his attention to the definitions given in the books, of that particular disease, and asking him whether he concurred in the definitions. How could the knowledge of the witnesses, of such subjects, be more fully tested? That is, in no just sense, reading books to the jury as evidence, or for the purpose of contradicting the witness." To the same effect is Hess v. Lowrey, 122 Ind. l. c. 233, *et seq.*

In State v. Wood, 53 N. H. l. c. 494-5, SARGENT, C. J., speaking to the point, said: "As to Dr. Ferguson's cross-examination, we see no reason for any objection to it. He had stated, as well he might, on direct examination, his knowledge of a particular subject, not from any experience or actual observation, but from what he had derived merely from reading and studying medical authorities. Then he was cross-examined as to that general reading, not by putting in the books, but by inquiries whether, in his general reading, he had not found particular theories laid down conflicting with the theory he had advanced as the result of his reading. Collier v. Simpson, 5 Car. & Payne 73, goes further than the present case. There TINDAL, C. J., in speaking of a medical expert says: 'I think you may ask the witness whether in the course of his reading he has found this laid down.' And that was upon direct examination. The Chief Justice further says, 'I do not think that the books themselves can be read, but I do

not see any objection to your asking Sir Henry Halford (the witness who was the president of the College of Physicians) his judgment and the grounds of it, which may be in some degree founded on books, as a part of his general knowledge.' "

We rule the point against defendant.

Other assignments of error are made and discussed. For example, it is contended that the court made comments prejudicial to the defendant in the progress of the case. We have considered these assignments one by one, but find no soundness in any of them, and shall not prolong the opinion by discussing them.

Our conclusion is that the case was well tried and that the judgment should stand. It is, accordingly, so ordered. Let it be affirmed. All concur.