MELVERN A. COOPER v. ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, Appellant.—148 S. W. (2d) 773.

Division Two, March 12, 1941.

*Cyrus Crane, Geo. J. Mersereau, John N. Monteith, James F. Walsh, Dean Wood* and *Horace F. Blackwell, Jr.,* for appellant.

*Clarence C. Chilcott* for respondent.

LEEDY, J.—This is an action brought by plaintiff (respondent) against defendant (appellant) to recover damages for personal injuries alleged to have been sustained by him while he was employed as a switchman in defendant's Topeka, Kansas, yards, and caused by the negligence of defendant. The amended petition upon which the cause was tried alleged that at the time in question plaintiff and defendant were engaged in either intrastate or interstate transportation, but as to which of said alternatives was true, plaintiff was unable to state. The petition further alleged (and it was admitted upon the trial), that the defendant had elected not to come within the provisions of the Kansas Workmen's Compensation Act, and specifically pleaded Section 44-544 of that act, which section, under the circumstances just mentioned, abrogates the defenses, among others, of assumption of risk and contributory negligence. The defendant's answer consisted of a general denial, and an allegation

that both plaintiff and defendant, at the time of the alleged accident, were engaged in interstate transportation, or in work so closely connected therewith as to be a part thereof, and therefore the Federal Employers' Liability Act governed the case, with which were coupled pleas of assumption of risk and contributory negligence, permissible defenses under Section 4 of the Federal Act. The reply was in the nature of a general denial. Plaintiff requested and the court gave his recovery instruction submitting the theory of liability under the common law, as modified under the Kansas Workmen's Compensation Act. The jury found for plaintiff and returned a verdict for the sum of $25,000. From the judgment entered thereon, defendant, after an unavailing motion for a new trial, has appealed.

The errors assigned relate to: (1) The refusal of defendant's requested peremptory instructions; (2) The refusal of defendant's instructions submitting the questions of assumption of risk and contributory negligence, and the giving of plaintiff's instruction withdrawing these questions from the consideration of the jury; (3) The propriety of permitting plaintiff's counsel to use and read from a medical textbook during his cross-examination of one of defendant's medical experts; and (4) Plaintiff's instruction on the measure of damages.

The facts: As stated, plaintiff was employed by the railroad as a member of a switching crew in its Topeka yards. It appears that there were ten numbered tracks in the yards, extending north and south, and numbered one to ten, from east to west. There was also a scales track to the west of track 10, and a cut-off track running north and west through the yards. Track 8 ran north off of the cut-off, and track 9 ran north off of track 8. Track 10 ran north off of the cut-off approximately 100 feet north of where track 8 left the cut-off. Tracks 9 and 10 were not a uniform distance apart, the distance between the center of the east rail of track 10 and the center of the west rail of track 9 varied from 30 to 7.05 feet, the latter measurement being approximately 200 feet north of the frog of the west rail of track 8 and the east rail of the cut-off. The width of the coal car on which plaintiff was riding was 10 feet, 4¾ inches, including the grab irons; the width of the refrigerator car on track 9 (with which plaintiff came in contact) was 10 feet, ½ inch, including the grab irons. The overhang of the coal car from the center of the east rail was 2 feet, 9¼ inches; the overhang of the refrigerator car from the center of the west rail was 2 feet, 7 inches. The clearance between these cars when opposite each other at the narrowest place between the tracks was 1 foot, 7¾ inches. Plaintiff was injured shortly before 9:00 p. m., while riding on the side of the coal car which was loaded with sand and was being moved south out of track 10 onto the cut-off. He was struck by the refrigerator car standing on adjacent track 9, the impact having occurred at or about the point of minimum clearance between the two tracks.

The crew of which plaintiff was a member went to work at 4:00 p. m., on the day in question, November 25, 1937. John Vandeventer was foreman of the crew and plaintiff was what is known as the fieldman. Plaintiff's duties were to line switches ahead of cuts when cars were being kicked, ride and brake cars going too fast, and in general, work ahead of, and away from the engine. In busy seasons the crew would handle as many at 250 or 300 cars each night. Defendant's witness Vandeventer, the foreman, testified that at about 7 o'clock he received the yard-checks or switch-lists which directed the activities of the crew.

Defendant's witnesses testified that page one of the switch-list showed the cars that "must" go on train No. 29, an interstate train operating from St. Joseph, Missouri, to Emporia, Kansas, and scheduled to leave Topeka at 10 o'clock; page two was known as "the west short check" and designated the cars for stations between Topeka and Emporia that "has to go on 91," (a local train made up at Argentine, Kans., and operating between Argentine and Emporia, Kans.), leaving Argentine at 9:50 p. m. and arriving at Topeka at 2:00 a. m.; that page 3 was known as the "west" or "straight west check" and designated the cars to be handled west in either train No. 29 or train No. 91 or in any train later than No. 29 that would permit by tonnage or number of cars, unless the tonnage or car limit of No. 29 would permit them being placed therein. If it did, they would fill 29 to capacity and place the remainder on No. 91. The coal car on which plaintiff was injured and a tank car to which it was attached were shown on page three as a part of the "west" or "straight west check." These two cars originated at Topeka and were destined for Emporia, Kans., and Quenemo, Kans., respectively, and would not leave the state in making the trip. The coal car had been in the yards before, but found to be overweight, and had been set back on track 10 at a point where the tracks were far apart so that some of the sand with which it was loaded could be unloaded into trucks and the weight reduced to the capacity of the car. A cross-hatch opposite the car number on the yard-check or switch-list signified that the coal car had to be weighed before being put into a train.

Vandeventer testified that when he got the 7 o'clock yard-check, he saw the coal car "was okay to be—to go out, but it had to be weighed first," and, from the fact that it was on the yard-check, marked "564" (the official station number assigned to Emporia), that it was billed for Emporia. He further testified that if he was ready he would start on the 7 o'clock switch-list when he received it, and if he wasn't ready it was his habit to have it with him when he went to supper so he could look it over while eating; that he was unable to say whether he had begun switching the 7 o'clock yard-check before eating supper on the night in question, but as well as he could recall, he had "switched out" the 4 o'clock list (so-called because he customarily received it at that hour upon going to work) which directed the

doing of "chores" around the yards, such as "pick up and one thing and another like that;" that in making up train 29 they would go around and gather up the cars shown on page of the switch-list, "west," and as a rule put them on track 2 to get them together; that they made up 29 in different ways, but that usually 29 would have so many cars going through with it and they would have cars going out on another track, that they would take the cars off of 29 and put them with the cars they had assembled at Topeka so that 29 would leave Topeka on a different track than the one it came in on.

Just before the crew went to supper at 8:20 or 8:30, track 9 had been shoved. The cut was pushed north on track 9 over the 4th Street crossing (4th Street intersects the yards some 200 or 300 feet south of the north end of the switch tracks), the crossing was cleared, and the engine backed south with the remaining cars, leaving the latter on track 9 south of 4th Street. After plaintiff uncoupled the cut he remained at the 4th Street crossing (480 feet north of the point where track 9 joins track 8) setting brakes. He testified he did not know where or how many cars were spotted south of 4th Street; that he did not go down to the south part of that track (9) after the cars had been shoved in there, but they were usually pushed as far north as they would go. The switch foreman testified that track 9, south of 4th Street, had been shoved full of cars just clear of track 8 and that it would hold 14 or 15 cars. After the crew shoved track 9 the engine backed south off of 9, switched over east to a clear track (the precise one does not appear), and came north to 4th Street where plaintiff had remained, and the engine was spotted for 20 minutes while the switching crew, including plaintiff, went to supper.

Thereafter, aside from weighing the car of sand, the crew had no other switching to do except the city draw when it came down into the yards and train No. 29 when it arrived (neither of which contingencies had yet arisen). When the crew finished supper, there wasn't anything else requiring immediate attention so the foreman "told the boys we would go up in No. 10 and if we had time we would get a car of sand that was in there, and weigh it and put it on train 29. . . . Well, I meant that if we had time to get the car of sand out and get it weighed before they shoved out of the city with the merchandise for 29, why, we would weigh that car." In that connection he further said if he hadn't had time he "would have just let that gone." Plaintiff returned to the vicinity of the crossing, and started to set brakes just south of 4th Street. Meanwhile the engine went to the south end and "came up in on No. 10" on which track there were two cars, the coal car in question, containing a load of sand, and a tank car. The tank car was on the south end and the coal car on the north. The engine came in from the south and attached itself to the tank car at a point where there is a clearance of some 25 or 30 feet between tracks 9 and 10. When the engine

coupled onto the tank car plaintiff "started across [west] to catch them as they were going out of track 10." He boarded the north end of the coal car on the east side thereof, and was riding on the side thereof with his feet in the stirrup and his hands on the grab irons. Vandeventer was riding on the sill on the north end of the coal car, and he testified that while so riding "Mr. Cooper looked up at me and he says, 'Are you going to weigh that sand and put it on 29?' I says, 'Yes, if we have time we will weigh it and put it on there.'" In that connection he testified on cross-examination that it was his intention to "kick that car of sand up on the cut-off and kick the tank car back in on No. 10 and then go up and weigh that car of sand" and then he "would come back down and dispose of the car of sand." That operation would have involved the following movements: Back out of track 10 onto the cut-off, throw the switch, kick the coal car up past its connection with No. 10, line the switch for track No. 10, kick the tank car in on track No. 10, line the switch to continue up the cut-off, couple onto the coal car, take it to the scale track, throw switch, move car onto scale, uncouple from it, weigh it, couple onto it, have it back down the cut-off and dispose of it.

While Vandeventer did not see what struck plaintiff, nor did the latter know, nevertheless the evidence warrants a finding that he was struck and knocked off the side of the coal car by the overhang of a refrigerator car standing on adjacent track 9. The engine was moving at the rate of about eight miles per hour. Plaintiff's back was to the east, and he was looking north toward Vandeventer when the accident occurred.

Train 29 usually arrived about 9 o'clock, although its schedule was at 10 o'clock. After the accident, which occurred just a few minutes before 9 o'clock, Vandeventer caused the coal car to be placed on track 7 where it remained until after 12 o'clock when he went off duty. Asked why he "didn't get it to 29," the witness replied, "Well, because the—I didn't have time to get it weighed." "Q. I see. Delayed by the occurrence of the accident? A. Yes, sir." It appears that the coal car left Topeka on train 91 sometime after 2 o'clock, and the tank car, containing water for company purposes, went out on train 29. Other pertinent facts will be referred to in the course of the opinion in connection with the points to which they relate.

I. The defendant did not ask to go to the jury on the question as to whether, at the time of the injury, the plaintiff and defendant were engaged in interstate transportation, or work so closely related thereto as to be practically a part of it. Instead, it asked the court to direct a verdict on the ground that it appeared as a matter of law that they were so engaged, which the court declined to do. The propriety of that ruling is the limited point with which we are to deal as the main question presented on this appeal.

The parties are in agreement as to the test of the applicability of the Federal Employers' Liability Act, i. e., whether the employee, at the time of the injury, was engaged in interstate transportation or in work so closely related to it as to be practically a part of it. [Shanks v. Delaware, L. & W. Railroad Co., 239 U. S. 556, 365 Sup Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797.] Neither the character of the employment generally, nor its actual or anticipated character at some time other than that of the injury, is of itself determinative of the question of the application of the act. "The true test is whether or not he was engaged in interstate transportation within the meaning of the act at the *very time* of his injury." [Kepner v. Cleveland, C. C. & St. L. Ry. Co., 322 Mo. 299, 15 S. W. (2d) 825.] The application of such test requires each case to be determined upon its own particular facts.

The quality of the movement as in interstate transportation is said to have arisen "because plaintiff, when hurt, was engaged in making up an interstate train, the movement toward which had already begun." Defendant argues that the car of sand had been assigned for transportation on train No. 29, an interstate train, and that plaintiff's crew was making up that train at the time of his injury, and that by reason of the delay caused by the accident, the car of sand was not weighed or switched as planned, but was left on track 7, and later that night switched and made a part of train No. 91, which carried certain cars destined for points in other states. The defendant in its brief says, "Because the crew had nothing pressing immediately after supper, Vandeventer decided to move the sand car to track 2, to send it out on No. 29, and so told plaintiff." The seven references to the abstract in support of the foregoing statement have been examined. They particularly fail to support that portion with reference to moving the sand (coal) car "*to track 2*," or, for that matter, to any specific track, although one of such references does say that "as a rule" track 2 was used for the purpose of making up train No. 29.

The facts touching the designation of the coal car for shipment on the interstate train, No. 29, have been outlined. We do not regard them as sufficient to constitute a definite assignment in interstate transportation. But whatever assignment or designation there was, it was concededly subject to the car being first weighed and its load found reduced within permissible limits, so that it was, at best, merely tentative or contingent. "It is obvious that not every movement of cars marked for eventual interstate transit is necessarily the commencement of an interstate journey." [Colangelo v. Pittsburgh & L. E. Railroad Co., 9 Atl. (2d) 391.] Nor do the facts of this case bring it within the rule of that line of cases holding that a switch movement of intrastate cars, made for the very purpose of connecting with interstate cars and thereafter forming an interstate

train, is a movement in interstate commerce. [Penn. Railroad Co. v. Morrison, 3 Fed. (2d) 986; Balt. & Ohio Railroad Co. v. Darling, 3 Fed. (2d) 987.] This, because the connection here was not direct and immediate. See Grigsby v. Southern Ry. Co., 3 Fed (2d) 988, wherein it was said: "In the present case, while the accident on the going trip might have delayed or affected the interstate return trip, the connection between the two is not such as, in our judgment, would justify changing the character of what would otherwise clearly be an intrastate train and an accident governed by state law into an interstate train and an accident governed by Federal law."

The fact that some six hours after the accident the coal car left Topeka on train 91, and the circumstance that such train carried certain cars, four in number, destined for points in other states, is not controlling. This because three of the cars are shown by the yard-check to have been picked up at Topeka and the fourth was picked up after the train left Topeka. There is no evidence that any of these cars had been switched at the time plaintiff was injured.

We shall not undertake to analyze and distinguish the many cases (approximately forty in number) cited in defendant's brief under this point. They have been examined, and in the light of the facts of this case, we think it apparent there is no evidence requiring the conclusion that plaintiff was engaged in interstate transportation, within the meaning of the Federal Act, at the time of his injury.

■ II. The next assignment complains of the action of the court in refusing defendant's requested instructions submitting the questions of assumption of risk and contributory negligence, and in giving plaintiff's instructions withdrawing these questions from the jury. The complaint is that there was substantial evidence of both defenses. Had defendant sought to invoke the protection of the Federal Act by requesting appropriate instructions submitting the question of the applicability of the act (and, undoubtedly, the facts warranted such submission, if requested), we would be confronted with quite a different problem. But it will be recalled that defendant did not ask to go to the jury on that question. In this situation, we think it is not in position to urge the complaint now made. The Kansas act, supra, abrogated those defenses, and as plaintiff submitted the case on the theory that he was engaged in intrastate commerce, and the Federal Act did not apply, there was no error in refusing to submit the questions of assumption of risk and contributory negligence.

■ III. We consider next the contention that plaintiff could not recover because there was no evidence that defendant was negligent. Defendant's position is, "The close clearance between tracks 9 and 10 was not negligence because defendant owed plaintiff no duty with

respect to the space between the tracks, and, therefore, the risk of injury from the close clearance was an ordinary one incidental to plaintiff's employment as switchman and known and assumed by him.'' Having held that the defense of assumption of risk was not in the case because abrogated by the Kansas statute, supra, defendant's position cannot be upheld, and the cases relied on, such as Tuttle v. Detroit, etc., Ry., 122 U. S. 189; Toledo, St. L. & W. Railroad Co. v. Allen, 276 U. S. 165, 48 Sup. Ct. 215 (holding the doctrine of assumption of risk applied as a matter of law), are not in point. It is true that courts will not prescribe any particular standard for the spacing or construction of tracks or yards. But in this case it is virtually conceded that the tracks were too close for the safety of plaintiff. Having constructed and maintained them in that close proximity to each other, the defendant is charged with notice that when it caused cars to be located on the two tracks in the position they were when plaintiff was injured, that there was danger of an employee being injured under the circumstances shown by this record. It is true plaintiff had worked in these yards for a considerable period of time, extending over several years, in fact. However, the plaintiff testified he did not know of the dangerously close proximity of the two tracks, and from testimony of the other members of the crew, none of them knew it. This is readily understandable upon a view of the scene of the accident as reflected by photographs thereof. Its real condition is more readily discernible in the aerial view; whereas the surface view tends to corroborate the plaintiff and the other members of the crew that it was not apparent. When a car was standing on track 9, at or near the point of minimum clearance between it and track 10, and another car was moving directly opposite on track 10, the situation amounted to a trap, and in view of the duty of the employer to use ordinary care to provide plaintiff a reasonably safe place in which to work, we are unwilling to say this was not negligence.

IV. Error is assigned with respect to the cross-examination of one of defendant's medical witnesses. It appears that the witness was about to be asked if he agreed with certain statements in the medical text which counsel held in his hand, and objection was interposed on the ground that it was necessary to ''qualify'' the witness by showing that he agreed with the author, counsel stating: ''Before he can read out of the book he has to show whether he agrees with him or disagrees; if he disagrees, he can't read . . . You have got to recognize him as an author on the subject.'' The effect of the point now presented is this: That it is improper to frame a question from a medical text to be propounded on cross-examination to a medical expert, unless it is first shown that said text is a standard and authoritative work. But it is obvious that the objection now urged was not raised in the trial below. Of course, it is well-settled that the contents of medical texts are not independent evidence, yet

there is a legitimate use of such books, at least on cross-examination, as pointed out in McDonald v. Metropolitan St. Ry. Co., 219 Mo. 468, 118 S. W. 78. Plaintiff's counsel was seeking to ascertain from the witness whether he agreed with certain statements in the text—the very procedure outlined in the objection. We do not agree, however, that before propounding such a question it is necessary to ascertain whether the witness agreed with the author. We need not develop the matter further because if there was any error in the course pursued, it clearly appears to have been nonprejudicial, in that no real point is made that the verdict is excessive in view of the injuries sustained.

V. It is claimed that plaintiff's instruction No. 4 on the measure of damages (which told the jury that in determining plaintiff's damages it might take into consideration, among other things, plaintiff's ability to work and earn money in the future) was prejudicially erroneous in that there was no testimony in the hearing of the jury as to plaintiff's age, and since all of his testimony was to the effect that his injuries rendered him totally and permanently disabled, any verdict arrived at would necessarily be purely speculative. The main case relied on, Phelps v. Salisbury, 161 Mo. 1, 61 S. W. 582, was an action for personal injuries, where an instruction was given telling the jury that in estimating plaintiff's damages they should take into consideration his age. There was no verbal testimony as to the plaintiff's age at the time of the accident or trial, and the point was made that the instruction was erroneous for want of evidence upon which to base it, and this the court sustained. The other cases cited deal with like situations. We do not regard them as authority for the proposition with which we are now dealing. The instruction in the case at bar does not, in terms, direct the jury to take into consideration the plaintiff's age.

As a part of plaintiff's case he introduced the mortality tables as shown by the Revised Statutes of 1879, and in offering the same, plaintiff's counsel said they showed "the expectancy of a man 40 years of age at 28.18 years." As a matter of fact, it seems clear that the 1879 revision was selected at the insistence or at least the suggestion of defendant's counsel. Plaintiff was earning $1,920 a year at the time he was injured. The defendant introduced as a part of the cross-examination of plaintiff a written application made by him for employment with the defendant. It was in the form of a sworn statement and was dated September 30, 1929, and showed that plaintiff was born November 1, 1897. We think the instruction is not vulnerable to the attack made upon it, and if defendant was not satisfied with it, and to save the point on appeal, it should have formulated and requested the court to give one conforming to its views.

From what has been said, it follows that the judgment should be, and it is, accordingly, affirmed. All concur.