### A. COHEN & CO. v. RITTIMANN.†

(Court of Civil Appeals of Texas. San Antonio. March 22, 1911. On Motion for Rehearing, June 29, 1911.)

1. NEGLIGENCE (§ 59*)—"PROXIMATE CAUSE."

"Proximate cause" of a negligent injury is a want of ordinary care which actively aids in directly producing the injury which might reasonably have been contemplated under the attending circumstances.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 72; Dec. Dig. § 59.*

For other definitions, see Words and Phrases, vol. 6, pp. 5758–5769; vol. 8, p. 7771.]

2. NEGLIGENCE (§ 61*)—PROXIMATE CAUSE—CONCURRENT CAUSES.

The proximate cause of an injury need not be the sole cause, but it is sufficient if it concurs with another cause in producing it.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 74, 75; Dec. Dig. § 61.*]

3. NEGLIGENCE (§ 62*)—INTERVENING EFFICIENT CAUSE.

Where the force of a primary cause is interrupted and entirely superseded by an intervening agency, which is itself the responsible cause of a resulting injury, the primary cause is not the proximate cause.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 76–79; Dec. Dig. § 62.*]

4. NUISANCE (§ 6*) — ACTS AUTHORIZED BY PUBLIC AUTHORITY.

A city cannot authorize one to engage in a business that would injure the lives, health, or property of persons in the vicinity.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 35–38; Dec. Dig. § 6.*]

5. NUISANCE (§ 25*)—ACTION FOR DAMAGES—DEFENSES.

The fact that a person has moved into proximity to a nuisance after it has been begun and its business carried on will not preclude him from a recovery of damages arising therefrom.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. § 104; Dec. Dig. § 25.*]

6. NUISANCE (§ 25*) — ACTIONS — DEFENSES—NECESSARY BUSINESS.

It is no defense to an action for damages alleged to have resulted from the maintenance of a nuisance that the business is a necessary one and useful to the public.

[Ed. Note.—For other cases, see Nuisance, Dec. Dig. § 25.*]

7. NUISANCE (§ 50*)—ELEMENTS OF DAMAGES.

Unhealthiness, pain, or sickness resulting from a nuisance are elements of damages which may be recovered.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 118–127; Dec. Dig. § 50;* Damages, Cent. Dig. §§ 198, 397.]

8. EVIDENCE (§ 508*)—SUBJECTS OF EXPERT TESTIMONY — MEDICAL OR SCIENTIFIC KNOWLEDGE.

Testimony of a physician as to the effect of decaying meat upon the surrounding air and upon any one breathing it is admissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2311; Dec. Dig. § 508.*]

9. APPEAL AND ERROR (§ 664*)—CONFLICT IN RECORD—STATEMENT OF FACTS AND BILL OF EXCEPTIONS.

Where the statements in the bill of exceptions are in conflict with the facts as set out in a statement of facts, they cannot be permitted to contradict the statement of facts.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 664.*]

10. WITNESSES (§ 268*)—CROSS-EXAMINATION—DRAWING OUT WHOLE OF TRANSACTION.

Where a party on a direct examination starts an inquiry into a transaction, he cannot object to the whole matter being brought out on cross-examination.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 931–948; Dec. Dig. § 268.*]

11. EVIDENCE (§ 548*)—OPINION EVIDENCE—EXAMINATION OF EXPERT — PERSONAL KNOWLEDGE OF EXPERT.

Where an expert is personally acquainted with the material facts in issue, questions relating thereto are not required to be based upon a hypothetical state of facts.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2365; Dec. Dig. § 548.*]

Neill, J., dissenting.

#### On Motion for Rehearing.

12. DEATH (§ 76*)—ACTION—SUFFICIENCY OF EVIDENCE—CAUSE OF DEATH.

Evidence in an action for having negligently caused the death of plaintiff's decedent by maintaining a hide curing business and creating noxious odors and a poisonous atmosphere, tried on the theory that such atmosphere and noxious odors were a concurring cause, in that they had so undermined and weakened decedent that she was unable to successfully resist a malarial fever arising from another cause, *held* insufficient to sustain a verdict for plaintiff.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 94; Dec. Dig. § 76.*]

Appeal from District Court, Bexar County; J. L. Camp, Judge.

Action by Louis Rittimann against A. Cohen & Co. Judgment for plaintiff, and defendant appeals. Reversed on rehearing, and remanded.

C. A. Davies, for appellant. Salliway & McAskill, for appellee.

FLY, J. This is a suit for damages instituted by appellee against appellant, in which it was alleged that appellee and his family were residing on the same block in San Antonio on which appellant was conducting a business of curing hides of cows and horses and other animals, which were brought to the place of business in a green state, and were allowed to remain in a condition of decay and decomposition; that the flesh was cut from the hides and piled up and left to rot and decay, and hides were hung up in a decaying condition, which caused great numbers of flies to accumulate, and that they were poisoned by substances used in curing the hides, and that they drifted into residences in the vicinity and died in great numbers; and that the odors from the hides and meat filled the atmosphere, which entered residences, causing sickness and

death. Appellee alleged that his daughter, Anna Bell Rittimann, 25 years of age, sickened from breathing the poisoned atmosphere, and died, and that appellee had been deprived of her labor in his house to his damage in the sum of $20,000. Appellant filed general and special demurrers and a general denial, and specially answered that the appellant was engaged in his lawful business and had exercised due care in curing hides, and that appellee had moved into the vicinity of the place of business of appellant knowing the kind of business conducted by appellant, in a locality set apart by an ordinance of the city of San Antonio for slaughterhouses and other like industries. The cause was tried by jury and resulted in a verdict and judgment in favor of appellee for $1,000.

A physician who treated appellee's daughter in her last sickness swore that she suffered with asthma, and that disease and malarial fever caused her death. He stated that malarial fever is produced in no other way except through the bite of a certain kind of mosquito, but stated further: "Decomposing, decaying, rotting matter is in small particles disseminating themselves into the air all the time, and a person breathing that air, it would have a tendency to depreciate human health, to undermine it; every day coming in contact with things like that it would get into the system through the lungs. The lungs are a kind of sifter. You take air into the lungs, through that the blood receives the oxygen, and then it is disseminated through the body generally. The lungs and the body would become, more or less, impregnated with the dead matter. The tendency to affect a person of a weak disposition would be to undermine the health of the person in that condition of health. A person in a weak condition would not be so apt to throw it off as a person who is robust. I saw Mr. Rittimann's daughter frequently. I believe the condition of that atmosphere undermined her health to such an extent that she was not in such condition to throw off diseases that she would otherwise have been. I say that condition weakened her, run down her health, caused her to be weakened and in a condition she would not have been in had she lived in other surroundings. Her chances for recovery would certainly have been decidedly better if she had been in different surroundings where there were other conditions and she had continued healthy and strong. When a person's physical condition is run down and emaciated, they are more susceptible to diseases, and of course, their ability to resist diseases is less. This girl was depleted and weak. She was run down when she was taken down with this malarial form of fever that she had. I do not know how long she was sick with the fever. I can't say, I don't remember." It was shown that a place like appel-

lant's was a menace to health and that the place was not conducted in a sanitary way, nor as it should have been. A witness stated that the condition of it was improved after the death of the girl, and that "there was decidedly room for improvement."

There was testimony conflicting in a degree with that of Dr. Berry given by Dr. Caffery, who testified that no particles of decaying matter accompany the odors, and that such odors are not disease bearers, and are not dangerous except in close rooms where they consume the oxygen. Dr. Caffery said: "I say it is absolutely impossible for bad atmosphere, an atmosphere from putrid matter, or scent, or odors to be disseminated in the blood and in the system by getting in contact with the lungs. Absolutely impossible for the system to become charged with decaying matter through odors. Ordinary odors arising from either decomposed vegetable or organic matter are not poisonous in themselves." He, however, admitted that, if the atmosphere was full of gases, it reduces the amount of oxygen and the person becomes sick by a lack of oxygen, so he and Dr. Berry arrived at the same conclusion, that sickness from filthy gases, by different methods of reasoning.

Dr. Aurelio Garcia de la Lama swore that the preparations used on the hides were injurious to health, and that "decaying meats get into the air and a person's lungs and hurt the blood. A person breathing decaying particles of meat that fill the air it hurts them. There is a whole lot of sickness caused by that. The odor in the air is caused on account of the hides; such odor or scent would hurt the health. The continual breathing of this atmosphere, impregnated with that odor, would always be sickness. It would produce all kinds of sickness." Among the diseases he enumerated were typhoid fever, colic, sores on the body, and sores in the mouth. One physician stated that he did not know "whether there is any other way for the communication of malaria, except by mosquito bite, but that is the theory of the present date." He testified further: "If you were to sit down by a dead horse and breathe the air week in and week out, breathe particles of that dead horse, it would always be detrimental. It takes a great deal of decay of that kind to affect the body. I do not think an hour would do it, nor a day wouldn't do it; but very likely continuously living in it would vitiate the entire system." Another physician testified that inhaling putrid matter might produce bilious fever, and also testified: "The effect of this smell would make the surrounding atmosphere unhealthy to breathe. Rotting is a process of decomposition, and the meat is gradually giving off an odor. Inhalation of this odor vitiates the system, generally, if it got into the circulation. When the air gets into the lungs, impregnated with putrid

matter, it is taken into the entire system. Where a person is continually breathing such air, the blood is not pure. It cannot be healthy. We would all have a hideyard in the room for that purpose if it was healthy. The putrid matter in the air when you breathe it is transferred from the tissues through the blood."

Of the five doctors who testified as to the cause of malarial fever, four stated that it came only through the bite of the mosquito known as "anopheles," and the other testified that was the theory, but that he did not know whether mosquito bites were the sole cause of malaria or not; so that even this matter was one of contested fact to be determined by a jury, although to laymen who have read the tests and most complete demonstrations made by several governments, as well as by some of the most scientific men of the world, it seemed, if there was one proposition in all the field of medical discovery that was so firmly established that enlightened doctors could not disagree about it, the theory that malarial fever could never be imparted save through the medium of one species of mosquito and yellow fever through that of another was that proposition. Still, at least so far as this case is concerned, the mosquito theory was contested, as there was testimony to the effect that "stagnant water is calculated to produce malaria. They get malaria by living near stagnant water. They get malaria from the water, whether mosquitoes carry it or not." If the young woman had an attack of malaria, and that with other complications caused her death, as was testified by one of the physicians, the jury was justified in finding that the malaria was caused by stagnant pools of filthy water permitted by appellant to stand on the premises and even run out into the street. The same physician also testified: "The fly is called the great typhoid messenger. Flies can communicate always anything that is carriable; that is transportable on their bodies. Neither flies or mosquitoes either would communicate the disease of asthma." The jury could have inferred from that testimony that malaria was transportable by flies. The proof showed that there were great swarms of flies about appellant's establishment, and that they went from there in vast hordes to the adjacent residences. But if the mosquito theory has been thoroughly demonstrated, as a large preponderance of the evidence showed and as seems to be the consensus of opinion of the scientific medical world, still there was evidence that tended to show that the filth and stench arising from the decaying poisonous matter that was allowed to remain on the premises of appellant weakened and undermined the health of appellee's daughter to such an extent that, when she had malaria communicated by mosquitoes, she was unable to resist it and rapidly succumbed to its inroads and died.

[1-3] As said by this court in the case of Railway v. Sweeney, 6 Tex. Civ. App. 173, 24 S. W. 947: "By proximate cause is meant such an act, wanting in ordinary care, as actively aided in producing the injury as a direct and existing cause. It need not necessarily be the last or sole cause, but it must be a concurring cause such as might reasonably have been contemplated as involving the result under the attending circumstances." The rule is thus enunciated by the Supreme Court of the United States in Milwaukee Railway v. Kellogg, 94 U. S. 469, 24 L. Ed. 256, and adopted by the Supreme Court of Texas in Railway v. Bigham, 90 Tex. 223, 38 S. W. 162: "The primary cause may be the proximate cause of disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved on a force applied to the other end; the force being the proximate cause of the movement, or as in the oft-cited case of the squib thrown in the market place. Scott v. Shepherd (Squib Case) 2 W. Bl. 892. The question always is, Was there an unbroken connection? Would the facts constitute a continuous succession of events so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? * * * In the nature of things there is in every transaction a succession of events, more or less dependent upon those preceding, and it is the province of a jury to look at this succession of events or facts, and ascertain whether they are naturally and probably connected with each other by a continuous sequence, or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time."

In the case of Shippers' Co. v. Davidson, 35 Tex. Civ. App. 558, 80 S. W. 1032, Davidson was driving a buggy across a gangway that had been built by the company into a street, and, when the horse reached the top of the gangway, a negro pushed a truck on which was a bale of cotton down the gangway in close proximity to the hind wheels, and the horse became frightened and overturned the buggy, and Davidson was thrown out and so injured that he died. This court held that the Shippers' Company was liable for damages arising from the death of Davidson. In that case different leading cases on the subject of proximate cause are cited and reviewed, and the following language appropriate to that as well as this case was quoted from White Sewing Machine Co. v. Richter, 2 Ind. App. 331, 28 N. E. 446: "Intervening agencies sometimes interrupt the current of responsible connection between negligent acts and injuries, but as a rule these agencies, in order to accomplish such result, must entirely supersede the original culpable act, and be in themselves responsible for the injury, and must be of such a character that they could not have been

foreseen or anticipated by the wrongdoer. If it required both agencies to produce the result, or if both contributed thereto as concurrent forces, the presence and assistance of one will not exculpate the other, because it would still be the efficient cause of the injury."

The evidence showed that the odors arising from the yard of appellant permeated the atmosphere for quite a distance around, entered the dwelling of appellant, and so affected the constitution and health of Anna Bell Rittimann, that she was seized with a fever, and in eight or ten days died. If the fever was not caused directly by the filthy atmosphere created by the putrid matter in appellant's yard, it had so weakened the body and affected the health of appellee's daughter that she could not resist the attack of fever and consequently languished and died. The first cause concurred with the last in producing death.

[4-6] Appellant may have had authority from the city of San Antonio to carry on the business of curing hides in the locality where he was engaged in such business, but the city did not, and could not, authorize him to engage in a business that would injure the lives, health, or property of owners of property in the vicinity. And the fact that appellee moved into proximity of the hideyard after it had been erected and the business was being carried on would not preclude him from recovery of damages arising from the nuisance. Sutherland on Damages, §§ 1055, 1056. Neither is it a defense that the business is a necessary one and useful to the public.

[7] Unhealthiness, pain, and sickness resulting from a nuisance are elements of damages, and those suffering in that way from a nuisance are entitled to recovery. Lockett v. Railway, 78 Tex. 211, 14 S. W. 564; Suth. on Damages, § 1051, and authorities cited in notes thereto appended. In the second subdivision of the statute of Texas relating to injuries resulting in death an action for actual damages is authorized "when the death of any person is caused by the wrongful act, negligence, unskillfulness or default of another." Article 3017, Rev. Stats. 1895. The only limitation upon the right to recover under that statute by those given the right of action is that "the wrongful act, negligence, carelessness, unskillfulness or default mentioned in the preceding article must be of such a character as would, if death had not ensued, have entitled the party injured to maintain an action for such injury." It is clear that under the authorities cited the daughter could have maintained an action for injury to her health, and if the injury resulted in death the father of the deceased daughter could maintain an action for damages resulting to him therefrom.

[8, 9] It was charged in the petition that hides were hung up by appellant in the open air in a decaying condition; that the air was impregnated with it; that it produced disease, was ruinous to health and poisonous to the human system, and breathing it had caused Anna Bell Rittimann to sicken and die. It was entirely proper to allow a physician to state the effect of decaying meat upon the surrounding air and upon any one breathing it. It was the opinion of the witness it is true, but experts are allowed to give opinions. It was shown that the decaying meat and hides in appellant's yard had filled the air with vile odors. The witness testified that he was acquainted with the condition of the yard, and had been for four years, and he was thoroughly acquainted with the facts, and it was unnecessary to put a hypothetical question to him. The third, fourth, fifth, sixth, and seventh assignments are overruled. It was not attempted, as is claimed in the seventh assignment of error, to show the sickness of other people in the community. The statements in the bill of exceptions are in conflict with the testimony of the physician as set out in the statement of facts, and cannot be permitted to contradict the latter. McMichael v. Truehart, 48 Tex. 216; Wiseman v. Baylor, 69 Tex. 63, 6 S. W. 743; Ramsey v. Hurley, 72 Tex. 194, 12 S. W. 56. It was proper under the pleadings and other evidence to permit experts to testify as to the effect of breathing the atmosphere from decaying flesh on the human system. Therefore the evidence objected to in the eighth and ninth assignments of error was legitimate and proper.

[10] When Antonio Sulaica was being cross-examined by appellant, he was asked if he had filed a suit against appellant for damages to his land, and, having answered in the affirmative, he was then asked by appellee what else he was suing for, and he answered that he was suing for damages to his own health and that of his family and for the death of his child. Appellant started the inquiry, and cannot object to the whole matter being brought out.

[11] The questions asked Dr. Berry and other medical witnesses in regard to the impure air undermining the health of Anna Bell Rittimann were not required to be based upon a hypothetical state of facts, because the experts were personally acquainted with the material facts in the case. Rogers on Ex. Test. § 31; Bellinger v. Railway, 23 N. Y. 42; Armendaiz v. Stillman, 67 Tex. 458, 3 S. W. 678.

The conclusions of fact and the deductions therefrom necessitate the overruling of the remaining assignments of error, which claim that there was no testimony to support the verdict.

The judgment is affirmed.

NEILL, J. (dissenting). Curing hides on one's own premises is not per se wrongful or a nuisance, but it may become so from the way such business is conducted. As any other legitimate business, it is presumed to

be lawfully conducted until the contrary is shown. Nor is every business which is injurious to health unlawful. The necessities of mankind require many things done which may be unhealthy. In conducting them only ordinary care is required to render them as little injurious as practicable. If such care was exercised by the defendant, he cannot be held guilty of negligence, though his carrying on the business may have contributed to plaintiff's daughter's death. The burden was on the plaintiff to show that her death was caused by the wrongful or negligent act of defendant alleged. The act must not only have been shown to be wrongful or negligent, but also to have been the proximate cause of her death.

It may be that the evidence is reasonably sufficient to show that the defendant conducted his business in a wrongful and negligent manner; but in my opinion it does not tend to show that such wrong or negligence was the proximate cause which contributed to her death; possibly it did, but it is a bare possibility. I think, therefore, the court erred in not peremptorily instructing a verdict for defendant, as requested by his counsel.

### On Motion for Rehearing.

FLY, J. A large portion of the motion for rehearing is devoted to a criticism of what was said by this court in regard to the intimation of a witness that malaria might be communicated in other ways than through mosquitoes, and it is made the excuse for an exhibition of feeling that should never be indulged in by an attorney towards a court, and which is dangerously near a line that he will not be permitted to pass. This court put no stress whatever upon the testimony in question, but based its opinion upon the fact that it appeared from the testimony that the daughter of appellee had been so weakened by breathing the vitiated air from appellant's premises that she was unable to resist an attack of malaria arising from inoculation by mosquitoes. If those facts are well established by the record, the opinion is correct, and this motion should be overruled, and, if not, the motion should be granted. The evidence indicated that the premises were not kept in as cleanly a condition as such places can be kept and all arguments as to the fitting condition of the premises being an innocent condition of affairs have no basis in law or fact, and are not worthy of consideration; the only question in this case being whether it was shown that the stench and filth created by appellant were a concurring cause with malaria in producing the death of Anna Bell Rittimann. If the question can be answered in the affirmative, appellant is liable.

The only positive evidence, if a belief or an opinion can be called positive evidence,

that the health of Anna Bell Rittimann had been affected by the stench and vile odors arising from the premises of appellant, is the testimony of the physician who treated her in her last sickness, and who gave a certificate, and corroborates it with his testimony that she died from malarial fever complicated with asthma, having been afflicted with the latter disease for many years. In the certificate no mention was made of any complications with disease or weakness arising from inhalation of the stench, but on the trial the physician says that he believed that her health was undermined by the odors, and that she was thereby rendered less able to resist the attack of malarial fever. That was the theory, the opinion of an expert, given long after the event, and a theory that was not inserted in the death certificate. The medical expert had not treated Anna Bell Rittimann for the 3½ years she had lived near the hideyard, although he testified he had seen her frequently, but it does not appear that he had seen her at any time shortly before her last sickness. In the face of the opinion of the physician that the young woman's health and strength were undermined by the noxious vapors, we have the positive testimony of her father, the appellee, who lived in the same house with her, as follows: "They were all sick with the fever about a month and a half; the balance of the family. She helped to wait on the balance of the family. She was the last one that was taken sick in the family. My girl's health was not run down all the time. It was not run down immediately prior to her taking sick. She was all right up to that time. Yes, sir; her health was good; in fact, she helped to take care of the sick children, and she was not run down in health at all, but was in good health just prior to taking sick." The father of the girl contradicts the testimony of the expert, and, even admitting that the latter was correct and the girl was run down, it was a mere surmise or opinion as to the cause of it, while the father perhaps gave an adequate cause for the run down condition, if it existed, in the fact that she had been nursing and waiting on a family afflicted with malarial fever for six weeks. This is the only testimony that applies directly to the condition of the girl immediately preceding her last sickness. The testimony leaves such grave doubts in the minds of the court as to the stench arising from the hideyard being a concurring cause in producing the death of Anna Bell Rittimann that we are constrained to reverse the judgment.

It is true that vast swarms of flies were bred about the hideyard and invaded the surrounding houses, and that one physician testified that "flies can communicate always anything that is carriable, that is transportable on their bodies"; but it cannot be inferred from that testimony that malaria,

which is communicated through the veins and arteries, could be carried on the body of a fly, and communicated as is typhoid fever, an intestinal fever, by being deposited in food or drink, and by that means carried into the stomach and intestines. The medical theory of modern times is that a certain species of mosquito filled with malarial fever germs pricks the skin of a human being, inoculates the blood with the germs, and in due course of time the fever may appear. We therefore infer that the witness did not intend to create the impression that malaria is borne by flies on their bodies, and by that means the disease communicated to men, for we understand it to be the theory, and one firmly established by facts, that malaria is never communicated to a human being except through the medium of female anopheles, a species of mosquito. The evidence in this case tended to show that no mosquitoes were bred in or about the hideyard, and necessarily the mosquitoes that produced malarial fever in appellee's family must have come from some other breeding ground. There was testimony tending to show that they might have come from pools in a creek near the house of appellee, and that appellant was not responsible for the malarial fever.

[12] We have given the facts a careful investigation, and we are unable to discover sufficient testimony to justify a jury in finding that the smells and noxious vapors arising from the premises had so undermined and weakened the body of appellee's daughter that she was unable to successfully combat the malarial fever, which arose from an independent cause, and therefore died. We thought in delivering our former opinion that perhaps there was testimony upon which a jury could find that the vile odors and stench were a concurring cause, but we now believe that the evidence was insufficient. The evidence of which the cause was capable, however, does not seem to have been fully adduced, and we are therefore unwilling to render a judgment for appellant.

The motion for rehearing is granted, our judgment of affirmance set aside, and the judgment of the lower court is reversed and the cause remanded.