FT. WORTH & R. G. RY. CO. v. McMUR-RAY. (No. 8061.)

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 12, 1914. Rehearing Denied Jan. 16, 1915.)

1. TRIAL ☞139—PROVINCE OF COURT AND JURY.

While the credibility of testimony is for the jury, the question whether there is sufficient testimony to go to the jury in the first case is for the court.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 338–341, 365; Dec. Dig. ☞139.]

2. DEATH ☞76 — EVIDENCE — SUFFICIENCY —CAUSE OF DEATH.

Evidence *held* insufficient to show that the death of plaintiff's husband was caused by germs or noxious odors thrown off from a pool of noisome water and refuse maintained by the defendant railway company.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 94; Dec. Dig. ☞76.]

3. EVIDENCE ☞570—OPINION EVIDENCE—EFFECT.

The jury is not in all cases bound by. the opinion testimony of experts.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2395; Dec. Dig. ☞570.]

Error from District Court, Erath County; W. J. Oxford, Judge.

Action by Mrs. Nellie McMurray against the Fort Worth & Rio Grande Railway Company. There was a judgment for plaintiff, and defendant brings error. Reversed and rendered.

Marshall Ferguson, of Stephenville, for plaintiff in error. Chandler & Pannill, of Stephenville, and R. F. Milam, of Ft. Worth, for defendant in error.

DUNKLIN, J. In the town of Dublin, the roadbed of the Ft. Worth & Rio Grande Railway was so constructed as to leave a ditch at the outer edge of the right of way and near the railway station, into which ditch water drained from a leaky water tank maintained by the company, and from land contiguous to the right of way. For lack of sufficient outlet, the water accumulating in the ditch formed a pool, estimated by different witnesses to be from 1 foot to 5 or 6 feet in width, from 3 feet to 60 feet in length and a few inches in depth; the size of the pool varying with the rainfall, but never going entirely dry. The railway company also maintained a toilet upon its right of way within a few feet of the pool, the refuse from which was washed into the pool. Water accumulating in the pool, under the circumstances recited, became stagnant and especially offensive by reason of the drainage from the toilet and mosquitoes in great numbers bred therein, to the annoyance of citi-

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

zens living in that immediate vicinity. A. J. McMurray with his family resided on a lot contiguous to the pool and his dwelling was situated at a distance therefrom, estimated by different witnesses to be from 30 feet to 60 feet. During the first portion of February, 1912, Mr. McMurray became ill, and his illness continued until his death, which occurred April 30, 1912. This suit was instituted by his widow and children against the railway company for damages sustained by them by reason of his death which plaintiffs alleged was caused by the negligence of defendant in so constructing its roadbed as to cause the formation of said ditch; in permitting water to escape from its water tank and accumulate in the ditch; and in maintaining the toilet at the place noted. Upon the cause of action so alleged, plaintiffs recovered a judgment for $3,500, from which the defendant has prosecuted this writ of error.

Several physicians testified upon the trial, including the family physician, who attended the deceased from the inception of his illness up to about two weeks prior to his death, at which time he was carried from his home in Dublin to a hospital in Ft. Worth, where a surgical operation was performed upon him shortly before his death. That operation disclosed, beyond controversy, that the deceased was afflicted with abscess of the liver, by reason of which a great quantity of pus had accumulated around the liver and in the plural cavity of one side of the body; and the physicians testifying all agreed that the immediate cause of death was abscess of liver so discovered.

Dr. E. D. Winters, witness for plaintiff, the physician who first treated the deceased, testified:

"I am a physician. I have been practicing medicine about 18 or 19 years. I live at Dublin, and was acquainted with A. J. McMurray in his lifetime. I attended him in his last sickness. During his last sickness he lived near the Frisco Depot, east of the depot; I guess 40 or 50 feet from the depot. I think it was the latter part of 1912 that I was called to see Mr. McMurray. I guess it must have been somewhere between 8 and 10 weeks that I attended him, probably about 10 weeks. When he was first taken, I made one trip and didn't see him any more for a few days, and from that time on I saw him usually once a day. When I first visited him, I found him suffering from la grippe. Mr. McMurray was a stout and robust man. I suppose he would have weighed 200 pounds, heavy set, chunky fellow. I considered him to be a real sick man the first time I visited him. He was complaining of his bones and muscles aching, and he had a severe headache. His tongue was coated. His skin at that time looked reasonably well. I found no other symptoms except la grippe at that time. In about a week or ten days after that time, I made a blood test and found he had some malaria in his blood. By blood test, I mean I got a specimen of the blood and put it under the microscope and found he had malaria in his blood. I found what you would term malaria germs. The malaria symptoms increased. After I discovered that he had malaria, I went there from once to twice a day until he left there to go to Ft. Worth. I sup-

pose three or four weeks from the time I made that test. I did not test him for typhoid. He had fever up to about the third week, and was then clear of fever about the third week; he was then clear of fever for about a week, and then his fever returned. His fever at first ran very high, as high as 104. He got to having chills; had two or three chills. His fever would rise, and after a few hours would go down, but not entirely down. The second chill he had was when I made the blood test. I was present when he had a chill. I thought that chill was due to malaria in the blood. His temperature went below normal after the second, or probably the third, chill, until finally there was a period when he didn't have any fever. After Mr. McMurray was clear of fever a few days, he began to complain of a pain in his right side, and his skin began to get yellow. His skin getting yellow might be an evidence of several things, but my opinion was that he was possibly having a formation of an abscess in the liver, and the discoloration was due to the locking up of the bile in the liver. This gradually developed until he had an abscess of the liver, which finally killed him. It is possible, I believe, for malaria to cause abscess of the liver, but is not given. I don't know in what way it is possible. An abscess of the liver can be caused by traumatism, a lick, or bruise over the liver. I had no evidence of that in this case. A man might by swallowing a fish bone or a pin cause abscess of the liver. I have nothing like that in this case. I inquired about that. We have different germs that might affect the liver or block the duct. My books teach that it is possible for malaria to produce abscess, but does not explain how it is done. This case was a chronic case. * * * We sometimes find the liver large when we have malarial poison, but don't know how it does that. The liver is the separator of the poison from the impure blood. When a crop of malaria germs matures, they die, and it is the remains of the dead germs that cause the fever. This malarial poison goes through the blood, and, of course, the blood going through the liver carries the poison through the liver. * * * The malaria had been distributed over Dublin in the fall. It was no worse in the neighborhood of this pool than anywhere else in Dublin that I know of. I was a practicing physician in Dublin at that time. There were no more cases in Dublin, outside of McMurray's case, in that neighborhood that I can recall. There were a number of cases in the fall and summer before, in other places in Dublin. And a mosquito in the fall or summer might have bitten some child or other person that had malaria and then bitten McMurray, and he could have taken it from that, and it could not be told where the mosquito came from. He might have come out of a pool where the child had malaria, or he might have come out of Restless creek, or he might have come out of the cannas in the child's yard in Dublin. In the flower beds in our yards, mosquitoes will breed and hatch. In our honeysuckle vines they will congregate and hatch, and in our cisterns. * * * When a crop of malaria germs matures, they die, and it is the remains of the dead germs that cause the fever. The dead germ finds lodgment in the blood, and the poison that is given off from these dead germs causes the fever. The liver acts as a separator of these poisons and produces bile, which is a natural secretion, and that works as a machine and keeps up perfect action. This malarial poison goes through the blood, and, of course, the blood going through the liver carries the poison through the liver; but it is not retained in the liver any more than in any other organ. * * * Those dead germs are called 'malarial plasmodium.' That is in a fellow's system—put into him like he is vaccinated. He may carry that malarial plasmodium in his system for years before it breaks out in a chill. McMurray may

have had that malarial plasmodium in his system for a long period of time before it broke out in a chill."

Dr. R. A. Miller, witness for defendant and who assisted Dr. Winters in treating deceased, testified:

"I do not think abscess of the liver is a symptom of malaria. * * * I didn't say that malaria causes enlargement of the liver. I said I found McMurray with enlargement of the liver. I don't think malaria could produce that. The enlargement of the liver evidently produced abscess on the liver. An abscess is a part of the enlargement of the liver. I don't say that the enlargement was produced by malaria; I don't think that it did. * * * McMurray had symptons, but not typhoid fever. A person could perhaps be inoculated with the germ by flies, but not by mosquitoes. * * * Sometimes I give a man something to act on his liver when treating him for malaria. I presume the poison would affect the liver the same as any part of the system in gorging it. Liver and gall bladder troubles are associated with malaria. In McMurray's case I found an enlargement of the liver and gall bladder."

Dr. R. O. Braswell, who did not attend the deceased, but who was called as an expert, basing his opinions upon the history of the case as related to him, testified as follows:

"There is a question as to whether there were other complications. In the absence of the Weedall test, I would be in doubt as to the typhoid complication. It would appear to me, though, that possibly there was a typhoid complication with the malaria at the beginning. That as a result of this complication the formation of the abscess on the liver was a secondary complication. Malaria affects the whole system. Malarial plasmodium reaches the liver same as other structures. It is a blood inoculation, and the blood is thrown back on the liver to be renewed. It is the function of the liver to re-form the worn corpuscles. On failure of the liver to perform that function, we would have engorgement of the liver, I think, with more or less inflammation. Abscess is the breaking down produced by inflammation—invasion of the pyro-genic bacteria. It is true, the whole system is filled with bacteria. Pus-producing bacteria must have a soil for development. Eliminating all the best-known causes of abscess of the liver, eliminating all those which the history does not disclose to exist, I would say that malarial invasion would weaken the structures of the liver and produce a soil proper for the development of the pyro-genic bacteria which produced the abscess. It has been my observation that a substantial majority of the people who have chronic malaria have enlarged livers. As to whether the foul odors arising from this ditch would cause infection of any kind in the human system, that atmosphere from that ditch is loaded with bacteria, is unsanitary to say the least of it, but the breathing of odors from decaying substances goes to the lungs, comes in contact with the blood, and it would be a rather far-fetched theory that would allow contaminated air to come into contact with the blood and not leave poison in it. All unsanitary surroundings are unhealthy, that it weakens a man's vitality in such ways that he would be more susceptible to the invasion of any bacteria or any disease. I think it is a pretty well established fact that a healthy man does not take anything, although exposed to it; but, if we are unhealthy and have some weak condition and then exposed, we do take on the infection or contagious diseases much more readily than if we were in good health. I think the surrounding conditions of this hole of water is calculated to lower a man's vitality. If a man lives in direct contact with a cesspool of that kind, and exposed not only to the inhalation of it, but being exposed to the flies and insects that breed and propagate there, it would have a tendency to make him more susceptible to bacteria of any kind, whether it be smallpox or any other disease, either contagious or infectious. Not knowing the exact form of the bacteria in the abscess, I would take it for granted that it was a mixed infection, and developed as a result of previous inflammation, and the bacteria developed with the conditions that the abscess was the result of that following typhoid fever. I have seen a few cases of the abscess of the liver and the gall bladder infections following rapidly on the heels of typhoid, showing that the fever broke, and within a few days other probable developments caused me to look with suspicion upon the typhoid infection. I am sure the abscess would not have formed on Mr. McMurray's liver without some previous existing condition leading up to that, and in this case everything is excluded except the malaria and the possibility of typhoid, and I attribute it to one or the other, or both, as the primary cause. But it has been my observation that an abscess of the liver is not so long in forming as that. I will say that malaria itself does not produce abscess on the liver. I say that under certain circumstances it would produce a condition for the development of the abscess."

Plaintiff, Mrs. Nellie McMurray, testified:

"I observed plenty of mosquitoes around there, and plenty of flies. I did not have so many mosquitoes in my house. I had screens. I protect myself against that. Some mosquitoes got in. My husband took sick the first of February. He was sick 11 weeks. My doctor said he had typhoid malarial fever. Prior to the first or middle of February when my husband took sick this time, he had never been sick that I know of. He was strong and healthy. I lived with him eight years before that, and he was never sick before, and was strong and healthy and worked every day."

Unless some of the statements contained in the testimony copied above have a contrary tendency, all the physicians who testified indorsed the following theories, which, according to their testimony, are maintained by the best medical authorities: First. Malaria in the human system can result from no other cause than mosquito bites; and flies can transmit typhoid fever germs, which may be taken into the body through the medium of food or drink, but in no other manner. Second. The female of a certain breed or species of mosquito may inoculate a person with the germs of malaria carried from another person first bitten, who has such germs in his blood; or such germs may be carried from stagnant water or damp places where the mosquito breeds. Third. Foul odors do not cause malaria, nor abscess of liver, nor any other disease, eo nomine. Fourth. The germ which causes malaria will not cause abscess of liver.

[1] We come now to a consideration of the contention presented by one of appellant's assignments, that the evidence is insufficient to support the judgment. Of course, it is exclusively the province of the jury to determine the weight of the evidence bearing upon an issue submitted for their decision. But it is also a well-established rule that, in the

first instance, it is the province of the trial judge, as a predicate for the submission of such an issue to the jury, to determine whether or not the evidence introduced to sustain an allegation in a pleading is sufficient to convince a reasonable mind that the allegation is true. If so, the issue must be determined by the jury; but, if not, the issue properly cannot be submitted to the jury for a failure of proof. And, if thus improperly submitted to the jury and determined by them favorably to the pleader, any judgment based on such a finding must be set aside. As the credibility of witnesses must be determined by the jury, in deciding whether or not the evidence is sufficient to support the verdict, it must be assumed that testimony bearing upon any issue is true whenever the testimony of one witness is not in conflict with that of another, and when such conflicts exist it is the province of the jury, and not the court, to reconcile them, if possible, or to accept the testimony of one witness to the exclusion of another.

[2, 3] From the foregoing it appears that the only theories suggested by the physician witnesses to account for formation of abscess of liver in Mr. McMurray's case are: First, possibly malaria produced the abscess germs in some manner unknown to the medical profession; second, the patient's vitality was reduced by malaria resulting from bites of mosquitoes breeding in the pool, and from foul odors arising from the pool, and in consequence of such partial loss of vitality he was rendered more susceptible, and did succumb, to attacks of abscess germs originating in some manner unknown; or else, third, such germs were generated by malarial plasmodium or decaying tissue of dead malarial germs deposited upon the liver; fourth, the abscess germs were caused by typhoid fever communicated by flies from the pool, if the patient had been so afflicted.

Taking those theories in the inverse order of their statement, it is to be noted that none of the witnesses testified that deceased was afflicted with typhoid fever; the nearest approach to such proof being the statement by Dr. Miller that he discovered symptoms of that disease, and the statement of Dr. Braswell, who did not treat deceased, but testified merely as an expert, in effect, that the history of the case as related to him indicated a probability of typhoid fever, but he further said the presence of typhoid fever could not be definitely determined except by the Weedall test—a test that was never made. This theory, as well as the others mentioned, is purely speculative and conjectural, suggesting only possible causes of the abscess, and of insufficient probative force to support the judgment. Cohen v. Rittimann, 139 S. W. 59. Those theories furnish the only basis for opinions of experts necessary to establish the indispensable causal connection between foul odors from the pool, or malaria produced by mosquitoes breeding therein, or typhoid fever attributable to the nuisance if the patient was so afflicted, and abscess of liver, and the testimony of the physicians relative thereto amounts to no more than suggestions of theoretically supposable possibilities that the abscess was caused by typhoid fever, if deceased had it, or that the lowering of the vitality of the patient resulting from foul odors and malaria traceable to the pool rendered the deceased more susceptible to the attack of abscess germs coming from an unknown source, or that the malarial germ either produced the abscess germ, or his decaying body, malarial plasmodium, deposited upon the liver, furnished a breeding bed for the incubation of abscess germs of some unaccountable origin. None of those witnesses gave any definite, positive opinion that the abscess can be accounted for upon any of those theories.

Appellees cite MacDonald v. Metropolitan St. Ry., 219 Mo. 468, 118 S. W. 78, 16 Ann. Cas. 810, by the Supreme Court of Missouri, in support of their contention that the jury were not bound by the testimony of the physicians, but were warranted in concluding from all the facts and circumstances in evidence that the negligence of appellant in maintaining the nuisance was the proximate cause of the disease which killed the deceased. We recognize the rule announced in that decision that a jury is not always bound by opinions of expert witnesses, but in some cases may base a verdict upon facts proven independent of such opinions. But that rule has no application in this case, since, in the absence of opinions by the physicians, the facts proven, tested by reason and common knowledge of unprofessional men, suggest no basis for a conclusion by the jury that abscess of liver, which killed the deceased, was caused by the nuisance. Even though it could be said that there was sufficient evidence to sustain a finding that, upon some one of the theories noted the disease which killed Mr. McMurray is traceable to the nuisance, we would still have a further question perhaps difficult of solution, but which we do not decide, viz., whether, under all the circumstances, the evidence was sufficient to support the further indispensable finding that the railway company reasonably should have anticipated that such consequences might result from the nuisance; in other words, a finding that the negligence of defendant in maintaining the nuisance was the proximate cause of the death of Mr. McMurray. Planters' Oil Co. v. Keebler, 170 S. W. 120.

The foregoing conclusions render it unnecessary to determine the merits of other assignments appearing in the brief of defendant.

For the reasons stated, the judgment is reversed, and as it appears plaintiff's case has been fully developed, and that no use-

ful purpose will be subserved by remanding it for another trial, judgment is here rendered for the defendant in the trial court, who is plaintiff in error here.

---

⊂⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes