STOVALL v. MARTIN et al. (No. 8917.)

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 9, 1918. On Motion for Rehearing, Jan. 25, 1919.)

**1. APPEAL AND ERROR ⬚931(1)—ACCEPTANCE OF TRUTH OF EVIDENCE.**

Court of Civil Appeals must accept as true defendants' evidence of identity of cattle; trial court having found for defendants.

**2. EVIDENCE ⬚472(6)—CONCLUSION—MIXED QUESTION OF LAW AND FACT.**

In suit to recover for taking of cattle claimed by one defendant as having been stolen from him, and having passed to plaintiff, defendant's positive statement that cattle in controversy belonged to him, being a conclusion on a mixed question of law and fact, was incompetent to prove title, and furnished no proper basis for judgment in defendants' favor.

**3. APPEAL AND ERROR ⬚931(6)—PRESUMPTIONS—CONSIDERATION OF INCOMPETENT EVIDENCE.**

After judgment for defendants, Court of Civil Appeals cannot presume that court considered, for purpose of furnishing basis for judgment, incompetent conclusion of one defendant that cattle in controversy belonged to him.

**4. TROVER AND CONVERSION ⬚35—TAKING CATTLE—OWNERSHIP—BURDEN OF PROOF.**

In suit for taking cattle claimed by one defendant as having been stolen from him and having passed to plaintiff, defendants had burden to show that cattle in controversy were included in cattle stolen from owner defendant at time of theft.

**5. TROVER AND CONVERSION ⬚40(3)—TAKING CATTLE—EVIDENCE—OWNERSHIP.**

In action for taking cattle claimed by one defendant as having been stolen from him, and having passed to plaintiff, plaintiff's purchase of cattle from a third person, and his possession and title under the purchase at time defendants took cattle, was prima facie proof of title in plaintiff, entitling him to recover, in absence of prima facie proof by defendants that cattle were among those stolen from owner defendant, and his property when taken.

On Motion for Rehearing.

**6. ANIMALS ⬚10—TAKING CATTLE—BURDEN OF PROOF—BRANDS AND EARMARKS.**

In suit for taking of cattle claimed by one defendant as having been stolen from him, and having passed to plaintiff, to overcome plain-

tiff's prima facie proof of title, by showing possession under a purchase, it was incumbent on defendants to identify cattle as included in those stolen from owner defendant, and so to do they had burden, not only to show that his V brand was placed on them by owner defendant, but also that his earmark of a slit had been changed by the thief to an underbit.

**7. EVIDENCE ⬚54—PRESUMPTIONS.**

In suit for taking of cattle claimed by one defendant as having been stolen from him and having passed to plaintiff, to make out defendant's ownership of the cattle, it was not permissible to build on a conclusion that the V brand on the cattle was defendant's, established by circumstantial evidence and presumptions, the further conclusion that thief had made a change in earmarks to conceal theft.

Appeal from District Court, Baylor County; J. H. Milam, Judge.

Suit by W. M. Stovall against I. E. Martin and another. From judgment for defendants, plaintiff appeals. Reversed, and cause remanded.

Andrews & Coombes, of Stamford, B. D. Glasgow, of Spur, J. A. Wheat, of Seymour, and Carrigan, Montgomery Britain, of Wichita Falls, for appellant.

Dickson, Kenan & Newton, of Seymour, G. E. Hamilton and T. T. Bouldin, both of Matador, and Cowan & Burney, of Ft. Worth, for appellees.

DUNKLIN, J. On May 15, 1916, I. E. Martin and H. L. Robertson took from the pasture of W. M. Stovall, in Dickens county, without his knowledge or consent, 45 head of steer calves, under a claim by Martin that the same belonged to him. Robertson, who was then a state ranger and in the employment of the Texas Cattle Raisers' Association, acted with Martin and in his behalf in such taking. Stovall was not present at the time, and, upon being told by Robertson that the animals had been so taken, entered his protest and demanded a return of the property, informing Martin and Robertson that he claimed title thereto by purchase from Ben G. Reynolds, who operated a ranch in Scurry county. He made diligent efforts to convince Martin of his title, but failed; the claim of Martin being that the animals were stolen from his pasture during the month of October of the previous year, and that therefore he still owned them, regardless of the purchase of them by Stovall. Under that claim of title Martin refused to return the cattle to Stovall, and a few days later drove them to his ranch in Motley county and has there held them ever since.

Stovall instituted this suit against Martin and Robertson to recover actual and exemplary damages for the taking of the cattle, upon allegations that defendants had wrong-

fully converted them to their own use. The case was tried before the court without the aid of a jury, and the trial resulted in a judgment in favor of the defendants, from which plaintiff has appealed.

Only two assignments of error are presented in appellant's brief, the substance of which present the contentions that the judgment was erroneous, in that, by uncontradicted evidence, plaintiff proved that he was in actual peaceable possession of the cattle when taken by defendants, and held title thereto through a regular chain of transfers extending back to D. O. Medley, who raised them and owned them when he sold them, and that there was no evidence introduced to justify the court's finding that the cattle were the property of either of the defendants at the time they were taken.

Much testimony was introduced upon the trial, which we shall not attempt to review at length. Admittedly the cattle were forcibly taken by defendants from plaintiff's pasture, without his knowledge or consent, at which time plaintiff was in actual and peaceable possession thereof, and such taking was under no claim of right, except that defendants believed the animals had been stolen from Martin, and therefore belonged to him. Testimony introduced by plaintiff showed conclusively that 249 head of cattle, a great majority of which were steer calves, were bought from D. O. Medley, off his ranch in Jeff Davis county, early in December, 1915, by the firm of Shultz, Gleim & Epsy, who immediately shipped them, together with about 350 head of other cattle in various other and different brands, to the stockyards in Ft. Worth, where they sold them through the Cassidy-Southwestern Commission Company to the firm of Marrs & Lake; that upon the same yards Marrs & Lake sold 166 head of the lot, some of them in Medley's brand and mark, and some in other brands, to Ben G. Reynolds, who purchased them through his agent, Nored & Spears Commission Company, and sold the rest to other buyers; that Reynolds then shipped the cattle to his ranch in Scurry county, and on or about April 1, 1916, sold them, together with about 105 head of other cattle purchased in the vicinity of his ranch, to W. M. Stovall, plaintiff in the case, who held and claimed them under that purchase.

The cattle which came from Medley's ranch were branded with the letter V on the right jaw, placed thereon with a "running" iron, as distinguished from a "stamp" iron, and the right ear was marked with an underbit, practically in the shape of the figure 7, made by cutting out a part of the ear, and such had been the brand and mark of Medley for a number of years, and were used upon all his cattle. Before the cattle purchased by Reynolds in Ft. Worth were shipped to his ranch, they were dehorned and branded on one hip with the letter S, which was Reynolds' brand; the branding iron used being a "stamp" iron. The 105 head purchased later by Reynolds in the vicinity of his ranch were also branded with the same brand; different branding irons being used.

According to the positive testimony of plaintiff, Stovall, supported by other proof equally as positive, the 45 head of cattle in controversy were included in the 283 head which he purchased from Reynolds, and were also included in the purchase by Reynolds from Marrs & Lake.

The proof showed conclusively that defendant Martin's brand was also the letter V on the right jaw, placed thereon with a "stamp" iron, but that the earmark used by him was a slit or hack in the lower part of the right ear, but that such a slit was not such an underbit as that used by Medley. It was also shown by uncontradicted proof that defendant Martin dehorned all his 1915 crop of steer calves in the summer of that year, and that his ranch included about 25,000 acres of land.

As noted, the proof was conclusive that Medley owned all the 249 head of cattle sold by him to Shultz, Gleim & Epsy, and that the same title passed to Marrs & Lake, and from them to their vendees, and in their brief appellees, Martin and Robertson, do not controvert the legally conclusive effect of that proof. But they do contend, in substance, that testimony introduced by them tended to show that the 45 head of cattle in controversy were not included in the sale to Reynolds by Marrs & Lake. Their theory, as shown in their briefs, is that the cattle were stolen from Martin and later included in the 105 head purchased by Reynolds in the neighborhood of his ranch after the purchase of the 166 head at Ft. Worth, and then included in the lot sold to Stovall by Reynolds; that after the theft the cattle were branded with the letter S and the earmark changed from a slit or hack to an underbit, such as shown on them when they were taken from plaintiff's pasture. And in support of that theory and contention testimony is set out in appellees' brief to the following tenor and effect:

First. Testimony establishing the theft of about 50 or 60 head of defendant Martin's calves about November 20, 1915, at the time he sold 442 head of such calves to Raldo Newman.

Second. Testimony of defendant Martin positively to the effect that the cattle in controversy were his cattle, and testimony of him and other witnesses to the effect that all those cattle were owned by Martin prior to his sale to Newman in November, 1915, and testimony of some witnesses identifying by flesh marks two of the cattle as having been formerly owned by Martin.

Third. Testimony of several witnesses, experienced cattlemen, who qualified as experts, to the effect that they examined the cattle in Martin's pasture after he had taken them from plaintiff's pasture, and that, in their opinion, the V brand on the jaw had been placed thereon with a "stamp" iron, the character of iron used by Martin, and not with a "running" iron, the character of iron used by Medley; that the cattle had been dehorned several months prior to the date of their purchase by Reynolds; that the cattle had the general appearance of being natives of the latitude of Motley county, where Martin's ranch was located, and not of the latitude of Jeff Davis county, in which Medley's ranch is situated; that the S brand on the cattle, which, according to plaintiff's contention, was placed by Reynolds in December, 1915, before he shipped the cattle to his ranch, was, in the opinion of the witnesses, placed several months later, and was placed with a "running" iron, instead of a "stamp" iron.

But we are cited to no evidence, and have found none, to identify the cattle as a part of the 50 or 60 head which Martin claims were stolen from him. Such proof was a necessary link in defendants' chain of evidence to prevent a recovery by plaintiff upon his prima facie proof of ownership, undoubtedly established, and which entitled him to a recovery, in the absence of other evidence legally sufficient to put in issue its truth. In the absence of such additional evidence, in order to put in issue the truth of plaintiff's prima facie proof of title, it would be necessary to indulge the presumption that the cattle in controversy were a portion of the lot stolen, and upon that presumption or inference that the thief, or some one claiming under him, sold them to Reynolds, and that the earmark was changed and the S brand used in order to conceal the theft.

In F. W. & D. C. Ry. Co. v. Jones, 106 Tex. 345, 166 S. W. 1130, our Supreme Court said:

"A presumption of fact cannot rest upon a fact presumed. The fact relied upon to support the presumption must be proved. 'No inference of facts should be drawn from premises which are uncertain. Facts upon which an inference may legitimately rest must be established by direct evidence, as if they were facts in issue; one presumption cannot be based upon another presumption.' 16 Cyc. 1051; Missouri Pac. Ry. Co. v. Porter, 73 Tex. 307, 11 S. W. 324."

See, also, G., C. & S. Ry. Co. v. Davis, 161 S. W. 932.

"It is a well-established rule that a presumption can be legally indulged only when the facts from which the presumption arises are proved by direct evidence, and that one presumption cannot be deduced from another. To hold that a fact inferred or presumed at once becomes an established fact, for the purpose of serving as a base for a further inference or presumption, would be to spin out the chain of presumptions into the regions of the barest conjecture." 10 R. C. L. bottom page 870.

See, also, Grand Fraternity v. Melton, 102 Tex. 399, 117 S. W. 788; First State Bank of Amarillo v. Jones, 107 Tex. 623, 183 S. W. 874; Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059; F. W. & R. G. Ry. Co. v. McMurray, 173 S. W. 929.

While defendant Martin did testify positively that the cattle belonged to him, yet his whole testimony shows that his statement to that effect was his conclusion based upon the mere fact that some 50 or 60 head were stolen from him in October, 1915, that he identified two or three of the steers by certain flesh marks, and all of them by his brand V on the jaw and his recollection of their general appearance. Such identification, however, merely relates to his ownership of such cattle prior to the theft of 50 or 60 head of calves in October, 1915, and not to the identity of any of those he missed after the theft.

[1] Accepting such evidence of identity as true, as we must do in determining the question now under discussion, it only proves that prior to the theft, which was contemporaneous with the date of the sale to Newman, Martin owned cattle of that description; but it fails to furnish prima facie proof that the cattle in controversy were included in the number that were stolen, and no other testimony introduced was of any greater probative force upon that issue than the testimony of Martin himself.

For identification of the cattle, special stress is made of the testimony of defendant Martin and others with respect to certain flesh marks by which the witnesses recognized two or three of the animals as the ones belonging to Martin prior to the theft. But no witness testified that those animals were not included in the lot sold to Newman, and the testimony of two of Martin's sons tended strongly to show that probably they were included in that sale to Newman and were shipped away by him.

The defendant Martin testified with reference to the cattle stolen as follows:

"At the time I delivered my steer calves to Newman, I did miss some calves, between 50 and 60 head, according to the count. I delivered all my calves in October, with the 10 per cent. out; that is, all of them with a 10 per cent. back. These steer calves I delivered them to Mr. Newman at Matador, and when they were tallied out at Matador there was 442 head of them. I counted them out, or helped to count them out; turned them out and loaded them on the train; that is all I know about it. I missed these cattle the day I tallied them out. * * * I said the day I missed them I was short 50 or 60 calves. * * * I did not find any evidence where anybody had stolen any cattle before I found these cattle down there at Stovall's, and I had not heard

of anybody driving any out of the country. * * * There was two of these animals I could identify by the flesh marks, the listed one, and a red bald-faced one with the underhack in its ear. There is another one, a dark black-tailed fellow; dark hair up to the hock, shows cold blood; he is out of a cow I bought. When I sold these cattle, I did not check them up to see whether or not that listed calf was in the bunch; I know I did not sell the listed calf, because I found him in this bunch. If he was shipped back, it might be him. I do not know whether Newman got that one or not; and I do not know whether Newman got this black-tailed one or not, nor the one with the slit in his ear. They were not checked up, to see what particular ones Newman got. I do not know whether this listed steer was shipped out by Newman or not; and whether this black-tailed one was shipped out by Newman or not, I do not know. I do not know but what this one with the slit was shipped out by Newman, but I do know that I found these steers up in Stovall's pasture, and I know they are mine."

Martin further testified that his brand V on the jaw was never recorded. Defendant Robertson, who first discovered evidence of the theft, testified that he passed through Martin's pasture two days after the delivery to Newman of the cattle he purchased, and further testified in that connection as follows:

"I struck the trail of a bunch of cattle about 300 or 400 yards from this pen going west; the trail indicated there was about 50 or 75 head of cattle in the bunch. Some of the tracks showed to be grown cattle tracks, and the rest of them were calves; it had been raining, and those tracks showed to have been made during the rain."

He further testified that he found the tracks of two horses and one mule along with the tracks of the cattle, and a boot track where the animals passed through a fence, the wires of which had been removed; the boot tracks being at two posts, from which the staples holding the wire had been pulled. W. G. Hall, who was with Robertson at the time he followed the tracks, testified: "It looked like there might have been 40 or 50 calves." But neither Martin nor any other witness attempted to testify whether any of the 40 or 50 calves stolen were steer or heifer calves, and the evidence shows that in Martin's herd there were calves of both genders.

[2, 3] The positive statement by defendant Martin in his testimony that the cattle in controversy belonged to him was, as clearly shown by his other testimony, but a conclusion drawn from the facts detailed by him and noted above. It was a conclusion upon a mixed question of law and fact, to decide which was exclusively the province of the court sitting as judge of the facts and law, and such conclusion, being incompetent to prove title, furnished no proper basis for a judgment in defendants' favor; nor can we presume that the court considered it for that

purpose. Henry v. Phillips, 105 Tex. 466 (loc. cit.) 151 S. W. 537, 538.

[4, 5] If it should be said that the expert testimony introduced by defendants to show that the V brand on the cattle was Martin's brand, and not Medley's brand, and that the underbit mark in the ear had originally been a slit or hack, which was Martin's, and not Medley's, mark, was legally sufficient to support a finding that the cattle had formerly belonged to Martin, and did not come from Medley's ranch, nevertheless such proof did not show title in Martin at the time of the taking, and did not relieve defendants of the burden which was clearly upon them, to show that the cattle were included in the number stolen from Martin in October, 1915; for, even if the cattle had formerly belonged to Martin and did not come from Medley's ranch, yet plaintiff's purchase of them from Reynolds, and his possession and claim of title under that purchase at the time defendants took them, constituted prima facie proof of title in him, which entitled him to a recovery, in the absence of prima facie proof by defendants that the cattle were included in the number stolen from Martin, and therefore were his property when taken.

As said already, plaintiff by clear proof established, prima facie, a right to recover, and by reason of the missing link in defendants' evidence, noted above, the truth of such proof was not legally challenged, and for that, if for no other, reason the judgment was erroneous.

Even though it could be said that the proof introduced by defendants tended in some measure to identify the cattle in controversy as a portion of the number stolen from Martin, yet such proof consisted largely, to say the least, of mere inferences based upon other inferences, and plaintiff's proof to the contrary is so overwhelming as to require a reversal of the judgment for that reason alone. And we are of the opinion further that appellant's assignments are sufficient to require a reversal of judgment on that ground, as well as on the other grounds mentioned. See I. & G. N. Ry. Co. v. Brice, 111 S. W. 1096, 1097 (loc. cit.), and other authorities there cited; P. & N. T. Ry. Co. v. Welshimer, 170 S. W. 263; Irving v. Freeman, 106 Tex. 38, 155 S. W. 931.

Accordingly the judgment is reversed, and the cause is remanded.

### On Motion for Rehearing.

Appellees seem to construe our conclusions on the original hearing as having been predicated principally upon the theory that proof was made of an outstanding title in the cattle in controversy in Newman, to whom sale was made of steer calves, as shown in our original opinion. They cite testimony to show that all of the animals

purchased by Newman were shipped to Chicago, and also they refer to a statement in appellant's brief to show that his counsel likewise construed such testimony.

Appellant, in his reply to motion for rehearing, insists that, as shown by other testimony of the same witness, those witnesses did not, in fact, know whether the cattle were shipped to Chicago, but only concluded that such was done, drawing such conclusions from the fact that Newman stated that he bought them for such a shipment, and that he loaded them on the cars for that purpose. The interpretation of our opinion, suggested above, is erroneous. We referred to the testimony of two of Newman's sons as tending to show that two or three only of the animals which bore certain flesh marks, and which flesh marks were especially relied upon by appellees as proof of title in Martin to all of the 45 animals in controversy, were probably included in the number sold to Newman; and we do not think that we were in error in that conclusion, especially when the testimony of those two witnesses is read in connection with the testimony of Martin himself, set out in the original opinion. But that conclusion was stated merely as additional argument in support of the judgment rendered by us, and the correctness of that judgment was not intended to hinge or depend upon that conclusion, alone.

The suggestion that 50 or 60 head of calves, which, according to the theory of defendants, were stolen from Martin, might have been driven to Toyahvale, and there disposed of to Shultz, Gleim & Epsy, and included in the shipment they made to Ft. Worth, is positively controverted by the testimony of Epsy, who was a disinterested witness, and the truth of whose testimony was not denied by any witness or circumstance in evidence. The possibility so suggested by appellees cannot be given the force of evidence.

Again, appellees insist that the failure of witnesses Bellows, Lake, and Norred, all of whom took part in the negotiation of the sale from Marrs & Lake to Reynolds in Ft. Worth, to testify that they saw any V brand on any of the cattle so sold to Reynolds, and the absence also of any testimony to the same effect from Roy Berry, who put the S brand on the cattle so purchased by Reynolds in Ft. Worth, were circumstances which tended to refute the contention made by plaintiff that some of the cattle included in that purchase were branded with a V brand. It does not appear from the record that any of those witnesses were interrogated upon that subject, and we know of no rule which would make an absence of such testimony from them a circumstance which should be weighed as evidence against the plaintiff.

Appellees further cite the testimony of Martin and the witness Ed Lisenby to the effect that, soon after the controversy first arose between Martin and Stovall over the title of the steers, Ben G. Reynolds told those witnesses he did not know whether any of the steers bought by him in Ft. Worth from Marrs & Lake had a V brand on them or not, and that the boy, Newt Craig, who was then in the employment of Reynolds, and who had been a caretaker of the animals sold to Stovall, also made a statement to the same effect, coupled with the further statement that the cattle sold to Stovall by Reynolds had been shipped from Amarillo. That testimony was introduced by the defendants to discredit the testimony of Reynolds and Newt Craig to the effect that the cattle sold by Reynolds to Stovall, branded V on the jaw, were purchased in Ft. Worth from Marrs & Lake. Aside from the testimony of those two witnesses, the testimony of J. W. Craig, who also saw the cattle which were purchased by Reynolds in Ft. Worth, and who had every opportunity to know the brand of those cattle, was direct and positive that some of them did have the V brand on the jaw, and no effort was made to impeach the credibility of that witness, who appears to have been disinterested. Nor was there any testimony whatsoever to show that any of the cattle purchased by Reynolds in the vicinity of his ranch had a V brand on them. The mere possibility that those cattle might have had a brand cannot be given force as evidence.

Furthermore, the earmark upon the cattle in controversy, which was an underbit, was as much a mark of identification as were the V brands. That mark, unquestionably, was Medley's, and not Martin's, mark, and notwithstanding any brands on the cattle proved conclusively that those animals were never branded by and stolen from Martin, which was his only theory of defense to plaintiff's suit, unless it had been originally a slit in the ear and afterwards changed to an underbit by some thief, who had stolen the cattle from Martin and made the change for the purpose of destroying evidence of the theft. The only direct and specific proof offered by defendants to show that such a change had been made amounted to nothing more than expert testimony that it could easily have been accomplished, and that the cut necessary to effect it would likely so heal within a period of three weeks or a month that it could not be distinguished from a cut several months old. In other words, such testimony was merely to the effect that it was possible that such a change had been made in the earmark, and not that it had been done, and proof of such a possibility furnished no evidence of the theft.

[6, 7] In order to overcome plaintiff's prima facie proof of title, which was unquestionably established, it was incumbent upon de-

fendants to identify the cattle as included in those stolen from Martin, and in order to do this the burden was upon them, not only to show that the V brand was placed on them by Martin, but also that the earmark had been changed by the thief from a slit to an underbit, since, according to defendant's own proof, Martin's cattle were not only branded with a V brand but had the slit, and not an underbit, in the ear. The evidence offered by defendants to sustain the conclusion sought to be established that the V brand had been placed on the cattle by Martin, and not by Medley, consisted of certain circumstances, which in no manner referred to the supposed change in the earmark, in connection with presumptions drawn directly therefrom. And even though it could be said that such circumstantial evidence and presumptions constituted proof sufficient, prima facie, to sustain the conclusion that the V brand on the cattle was Martin's brand, without the necessity of building other presumptions upon those presumptions, yet under the rule of evidence referred to in the original opinion it would not be permissible to build upon the conclusion so established, the further conclusion that the thief who stole the cattle had made the change in the earmark in order to conceal the theft.

After a very careful review of the testimony and of the arguments advanced in support of the motion for rehearing, we have concluded that same should be overruled; and it is so ordered.

Motion overruled.